## HERBERT v. RIDDELL.

No. 13096.

United States District Court,
S. D. California, Central Division.

Feb. 28, 1952.

George T. Altman, Gang, Kopp & Tyre, Martin Gang, Los Angeles, Cal., Edward E. Colton, New York City, for plaintiff.

Walter S. Binns, U. S. Atty., E. H. Mitchell, Edward R. McHale, Asst. U. S. Atty., Eugene Harpole, Frank W. Mahoney, Sp. Attys., Bureau of Internal Revenue, Los Angeles, Cal., for defendant.

YANKWICH, Chief Judge.

By this action the plaintiff, F. Hugh Herbert,—to be referred to as Herbert,—seeks to recover $15,214.68 and $4,167.91 interest or a total of $19,382.59 as a refund of federal income taxes paid on a deficiency assessment for the year 1945, and $129,299.97 and interest in the amount of $27,662.44, or a total of $156,962.41 on a deficiency assessment for the year 1946. Involved also is the failure to allow deductions for alimony payments, and to allow to the plaintiff an increase on the cost basis of $11,000 upon the sale of his residence in 1946, by reason of permanent improvements made upon the property.

The fundamental problem in the case turns upon the rejection by the Treasury Department as to both years of the Abbott-Herbert Corporation as a distinct entity and the disregard by the Department for taxation purposes of its subsequent liquidation. These grounds were frankly stated in the 30-day letter of the Treasury Department, and presents the important question involved in this case. Such forthrightness is appreciated. The more so as the conclusion was arrived at,—as will appear further on in the discussion,—on an interpretation of undisputed facts.

The same pattern was followed in the trial of this case. The Government presented no oral testimony. The only live witnesses who testified in the case were the witnesses for the taxpayer, including the taxpayer himself. The Government's case consisted chiefly of cross examination of the witnesses and of certain documentary evidence which they introduced. They seek to justify the action of the Treasury Department on the basis of the inferences which they say can be drawn from the testimony in the case and the documentary evidence introduced.

As this is not a review of a tax court decision,[1] the trial judge has the great freedom of drawing his own inferences from the facts before him. And his most important function is the right to disregard even uncontradicted testimony, if, from the manner and attitude of the witnesses, or from the inherent improbability of their story, or because the witness' declarations are contradicted by his acts as expressed by contemporaneous declarations or documentary evidence, it carries no conviction to him.[2]

1. 26 U.S.C.A. Sec. 1141.

2. Broadcast Music, Inc., v. Havana Madrid Restaurant Corp., 2 Cir., 1949, 175 F.2d 77, 79–80; Grace Bros. v. Commissioner, 9 Cir., 1949, 173 F.2d 170, 171, 173–174; and see, United States v. United States Gypsum Co., 1948, 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746.

So this case, more than the average tax case, turns not so much on a question of law, but on the application of certain fundamental principles promulgated by our highest courts to certain facts and a proper appraisal of the facts.

We begin by referring to the principles of law which govern cases of this character.

# I

## The Taxpayer's Right to Reduce Tax Liability

■ In these days when, through nation-wide agitation, there is constant talk of "tax loop-holes" (to which counsel for the Government referred during the oral argument), it is well to point to the fact that the Supreme Court of the United States ever since the question came before it in 1874,[3] has insisted that a taxpayer may *legally and honorably* take means to minimize his tax. The case about to be referred to is of great importance. It arose under the Internal Revenue Act of 1864, which required certain instruments to be stamped.[4] It is an historical fact that the period following the War between the States brought about the broadest exercise of taxing power by the Government. In the case mentioned, defendant Isham was tried on an information which charged him with violation of the statute. He was the superintendent of a mine in the State of Michigan. In behalf of the Company, he issued drafts in denominations of from $1 to $10. These drafts were sent to Isham from the New York Office in blank. He signed them as he drew them. The paper circulated as currency at local stores. And when merchants accumulated a number of them ranging from $1,000 to $2,000, they were sent to New York for redemption, or Isham took them up and gave the holder a draft on New York for the total amount. The question arose whether the form adopted was made with the intent to avoid the stamp tax. The Judges of the Circuit Court disagreed. That and other questions were certified to the Supreme Court. In ordering the information dismissed, the Court attacked, in outspoken language, the problem of evasion and said distinctly that the mining company could pay its debts in this manner even if it were apparent that the object was to avoid the tax. Mr. Justice Hunt, speaking for a unanimous court, said: "It is said that the transaction proved upon the trial in this case, is a device to avoid the payment of a stamp duty, and that its operation is that of a fraud upon the revenue. This may be true, and if not true, in fact, in this case, it may well be true in other instances. To this objection there are two answers: 1st. That if the device is carried out by the means of legal forms, it is subject to no legal censure. To illustrate. The Stamp Act of 1862 imposed a duty of two cents upon a bank check when drawn for an amount not less than twenty dollars. A careful individual, having the amount of twenty dollars to pay, pays the same by handing to his creditor two checks of ten dollars each. He thus draws checks in payment of his debt to the amount of twenty dollars, and yet pays no stamp duty. This practice and this system he pursues habitually and persistently. While his operations deprive the government of the duties it might reasonably expect to receive, it is not perceived that the practice is open to the charge of fraud. He resorts to devices to avoid the payment of duties, but they are not illegal. He has the legal right to split up his evidences of payment, and thus to avoid the tax. The device we are considering is of the same nature." [5]

The principle has been reaffirmed repeatedly by the Supreme Court and by the Courts of Appeals.[6] In one of these cases,

---

3. United States v. Isham, 1874, 17 Wall. 496, 21 L.Ed. 728.

4. 13 Stat. at Large, Sec. 158, p. 298, amended by Act of July 13, 1866, 14 Stats. at Large, 144.

5. United States v. Isham, 1874, 17 Wall. 496, 506, 21 L.Ed. 728.

6. Gregory v. Helvering, 1935, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596; Superior Oil Co. v. State of Mississippi ex rel. Knox, 1930, 280 U.S. 390, 395–396, 50 S.Ct. 169, 74 L.Ed. 504; Commissioner of Internal Revenue v. Tower, 1946, 327 U.S. 280, 288, 66 S.Ct. 532, 90 L.Ed. 670; United States v. Cumber-

the Supreme Court, in 1935, epitomized the principle in a sentence which has been quoted approvingly ever since: "The legal right of a taxpayer to decrease the amount of what otherwise would ·be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted".[7]

Despite the fact that in these cases, it is constantly urged that the motive to avoid taxation is important, the fact remains that, as Judge Learned Hand has stated, the Supreme Court "has never, so far as we can find, made that purpose the basis of liability".[8]

The same opinion gives the true criteria by which to determine whether a transaction is real or not for taxing purposes: "The question always is whether the transaction under scrutiny is in fact what it appears to be in form; a marriage may be a joke; a contract may be intended only to deceive others; an agreement may ·have a collateral defeasance. In such cases the transaction as a whole is different from its appearance. True, it is always the intent that controls; and we need not for this occasion press the difference between intent and purpose. We may assume that purpose may be the touchstone, but the purpose which counts is one which defeats or contradicts the apparent transaction, not the purpose to escape taxation which the apparent, but not the whole, transaction would realize." [9]

## II

### The Taxpayer's Choice of Business Structure

■ In seeking to achieve certain business or tax results, the taxpayer is free to choose the form in which he will do business. When he does so, he must accept the tax consequences, whether he contemplated them or not.[10] And if, having chosen a form, he actually carries on the business under the structure adopted, the Government cannot deprive him of the benefit of the chosen form, except upon a showing that the form is unreal or sham. These concomitant principles have been well summarized by the Supreme Court: "A taxpayer is free to adopt such organization for his affairs as he may choose and having elected to do some business as a corporation, he must accept the tax disadvantages.

"On the other hand, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute." [11]

■ So the Treasury Department is not, —as seems to have been assumed in this suit from a misreading of this decision,— free to disregard the corporate entity where a tax benefit would result to the taxpayer. Conditions must exist which warrant the conclusion that a particular organization served *no actual business purpose*. Nor, in doing so, can the Treasury Department, when dealing either with two corporate entities, or with a group of individuals and a corporate entity, seize upon common ownership or control as the sole determinant. That criterion adopted by the Supreme Court early in the history of income taxa-

land Public Service Co., 1950, 338 U.S. 451, 455, 70 S.Ct. 280, 94 L.Ed. 251; Howell Turpentine Co. v. Commissioner, 5 Cir., 1947, 162 F.2d 319; United States v. Cummins Distilleries Corporation, 6 Cir., 1948, 166 F.2d 17, 20–21.

7. Gregory v. Helvering, 1935, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596.

8. Chisholm v. Commissioner, 2 Cir., 1935, 79 F.2d 14, 15, 101 A.L.R. 200.

9. Chisholm v. Commissioner, supra, 79 F.2d at page 15.

10. New Colonial Ice Co., Inc., v. Helvering, 1934, 292 U.S. 435, 441–442, 54 S.Ct. 788, 78 L.Ed. 1348. See the writer's opinion in Pacific Magnesium, Inc. v. Westover, D.C.Cal., 1949, 86 F.Supp. 644, affirmed in Pacific Magnesium, Inc., v. Westover, 9 Cir., 1950, 183 F.2d 584.

11. Higgins v. Smith, 1940, 308 U.S. 473, 477, 60 S.Ct. 355, 358, 84 L.Ed. 406.

tion[12] has been repudiated by recent cases.[13] In the latest case on the subject, decided in 1949,[14] the Supreme Court has said specifically that that criterion no longer is determinative of taxability or non-taxability. "Complete ownership of the corporation, and the control primarily dependent upon such ownership—the important ingredients of the Southern Pacific case—are no longer of significance in determining taxability."[15]

For, regardless of the motivation to reduce taxation and of ownership, if the assumption of a particular form, such as the corporate form, is followed by the exercise of corporate powers and the carrying on of the business by the corporation, the corporate identity cannot be disregarded. As said by the Supreme Court: "The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity."[16]

And the Court of Appeals for the Second Circuit has stated that this consideration is controlling whether there be complete ownership and control or not: "The decisive question is whether the corporations were created to, or did, in fact, serve a recognizable business purpose. If so, the same tax consequences would flow from the petitioner's dealings with them as if they were not owned and controlled by him; if not, the Commissioner was not bound to ignore their economic identity with their owner."[17]

And, generally, despite such ownership and control, and despite the fact that an individual or corporation, through such control, may be the ultimate beneficiary and the subsidiary the means to further its ends, the identity cannot be disregarded "if the corporate device is used for business advantages".[18]

The quantum of the business is not important. Thus, the Court of Appeals for the Second Circuit has held that the entity may not be disregarded if the corporation "does some 'business' in the ordinary meaning."[19] Holding title to property by a family-controlled corporation which had a bank account, made leases, paid electricity and retailed it to tenants was held

12. Southern Pacific Company v. Lowe, 1918, 247 U.S. 330, 337, 38 S.Ct. 540, 62 L.Ed. 1142.

13. Burnet v. Commonwealth Improvement Co., 1932, 287 U.S. 415, 419–420, 53 S.Ct. 198, 77 L.Ed. 399; Moline Properties, Inc., v. Commissioner, 1943, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499; Inland Development Co. v. Commissioner, 10 Cir., 1941, 120 F.2d 986.

14. National Carbide Corp. v. Commissioner, 1949, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779.

15. National Carbide Corp. v. Commissioner, supra, 336 U.S. at page 429, 69 S.Ct. at page 730. And see, John L. Denning & Company v. Commissioner, 10 Cir., 1950, 180 F.2d 288, 290–291; Bond v. Commissioner, 1950, 14 T.C. 478, 482–484; Estate of Whitfield v. Commissioner, 1950, 14 T.C. 776, 782–784.

16. Moline Properties, Inc., v. Commissioner, 1942, 319 U.S. 436, 438–439, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499. In the same case, Mr. Justice Reed, in giving the true

meaning of the oft-quoted passages from Higgins v. Smith, 1940, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406, and Gregory v. Helvering, 1935, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596, states: "In general, in matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal. In such situations the form is a bald and *mischievous fiction.*" (Emphasis added.)

17. O'Neill v. Commissioner, 2 Cir., 1948, 170 F.2d 596, 598.

18. Railway Express Agency, Inc., v. Commissioner, 2 Cir., 1948, 169 F.2d 193, 196; and see, Rogan v. Starr Piano Co., 9 Cir., 1943, 139 F.2d 671, 674; National Investors' Corporation v. Hoey, 2 Cir., 1944, 144 F.2d 466, 468; Paymer v. Commissioner, 2 Cir., 1945, 150 F.2d 334, 336; Sheldon Bldg. Corporation v. Commissioner, 7 Cir., 1941, 118 F.2d 835; L. T. Campbell, Inc., v. Commissioner, 5 Cir., 1947, 159 F.2d 629.

19. National Investors' Corporation v. Commissioner, supra, 144 F.2d at page 468.

sufficient to distinguish the corporation from the two partners who had organized it for the purpose of protecting a building which they owned from attachment.[20] And, even though a corporation had no books, records, and did not hold any corporate meeting, where it was used to secure a loan in a substantial amount, it acquired a "flesh and blood" existence which could not be cast aside.[21]

It follows that even a single transaction, if of a business character, is sufficient to establish the identity of the corporation. And there is nothing in modern corporation law which forbids the organization of a corporation for the purpose of carrying on a single venture.[22]

### III

### The Facts

#### (A) General Outline of Facts.

If we assay the facts in the case by the touchstone of the principles just enunciated, it is evident that the corporation was not sham, that it was organized for the purpose of producing, among other things, a motion picture from a play before it was known or surmised that the motion picture would have the success which the play had, that it was organized under the law of California for the general purpose of producing motion pictures, that a motion picture was produced under its direction, with the cast and director being chosen by it, that it financed the production through a huge loan of $400,000, secured from the bank, that during its existence, the corporation had an entity of its own. It had an office adequate for the transaction of its business. Its corporate acts were duly recorded in books kept for that purpose, and, in all other respects, it performed corporate functions of the type which courts have held to characterize a corporation as a distinct entity for tax purposes despite the fact that the corporation was closely owned either by another corporation or by a small group of individuals. The Government by "sublimating", as it were, certain facts and by selecting here and there a statement, sometimes a year distant from another, would have us wipe out this entire structure. So it is necessary to set forth in greater detail the facts in their proper order as they appear in the record.

At first, it should be borne in mind that this is not the case of a person or persons who once they are,—to use the language of the street,—"in the money", seek a way of avoiding taxation. The plaintiff and his chief associate are respectively writer and producer-director of distinction in the theatrical field. Even today Mr. F. Hugh Herbert has what is known as a "smash hit" production on Broadway, New York, "The Moon is Blue", starring Barbara Bel Geddes, Donald Cook and Barry Nelson. George Abbott is the director of another current "smash hit", "Call Me Madam", currently starring Ethel Merman and Paul Lukas.

Herbert has been a playwright, motion picture director and writer of motion pictures and author since 1920. In 1942, he wrote a play called "The Holy Cow", the name of which was subsequently changed to

---

20. Sheldon Bldg. Corporation v. Commissioner, 7 Cir., 1941, 118 F.2d 835.

21. Paymer v. Commissioner, 2 Cir., 1945, 150 F.2d 334, 336–337, where the Court said: "We think that Raymep was active enough to justify holding that it did engage in business in 1938. The absence of books, records and offices and the failure to hold corporate meetings are not decisive on that question. Though Raymep was organized solely to deter creditors of one of the partners, it apparently was impossible or impracticable to use it solely for that purpose when it became necessary or desirable to secure the above mentioned loan in a substantial amount",

And see cases cited under Note 15.

22. Thus, in California, corporations have been recognized as organized for pecuniary profit, although they were organized for one purpose only, such as sale and liquidation of property and disrtibution of proceeds to former partners; Baldwin v. Miller & Lux, 1907, 152 Cal. 454, 456, 92 P. 1030; Lewis v. Curry, 1909, 156 Cal. 93, 97–98, 103 P. 493; or acquisition and liquidation of the assets of a federal receivership estate; Bailey v. Guaranty Liquidating Corp., 1936, 16 Cal.App.2d 401, 403–404, 60 P.2d 579.

"Kiss and Tell". This was the first play written by him which was subsequently made into a motion picture. The play on its being produced in New York, as a result of critical acclaim, achieved great success. There was a large advance sale of tickets, with tickets selling five or six months in advance. A Chicago company was planned and subsequently two other companies, so that there were at one time four companies simultaneously playing it in different cities. In 1943, after the success of the play, Herbert had a discussion with a Mr. Sol Siegel, who was an associate producer. He was an old friend of his and even before the writing of "Kiss and Tell", they had discussed the possibility that they might engage in independent production. When the play became a success, Herbert was in New York and Siegel in California. They talked over the long distance telephone. Siegel congratulated him and suggested the possibility of realizing their mutual desires to enter into independent production. He thought that the play might be the opening wedge for doing that. At the time, there were several individuals in Hollywood who were producing pictures independently and had them released and distributed by various organizations and major studios. They obtained their financing on the basis of either their reputation or of the reputation of the property which they planned to make. They obtained loans and they were autonomous in that they produced the picture and entered into agreements with distribution organizations or major studios to release or distribute their product. One of the problems which confronted Herbert, which he referred to as "the most galling thing to a motion picture writer", was that when he is under contract to a studio or has sold a property to it, he loses control of the material. As he put it, "whereas he may have written a story of a pearl diver, there is nothing in his power to prevent the studio which purchases that story or retains his services from changing that pearl diver into a paratrooper, which may have disastrous effects upon the characterization which the author may have intended." (Transcript, page 5)

Sometimes they keep nothing but the title, and *then* change the title. It was because he had been the victim of this type of humiliating experience that Herbert, having written a play which was successful, saw an opportunity to retain control of the property by producing the picture himself, so that any decision to change the characterization would be at his option.

To control of changes in story or characterization should be added control of direction. As Herbert stated: "Under normal Hollywood procedure, when you write a story, when you are under contract to a studio for a weekly compensation, or where you have sold a story outright to a studio, the author is not consulted as to the director or the members of the cast. Sometimes he is, but he need not be consulted. In many cases, my own experience, I have done everything but go on my knees to an executive and implore him not to use that title, not to use that director,—this personality, and my pleas have fallen on deaf ears." (Transcript, p. 52)

So a set-up which would allow him to control not only the content of the play, but would give to him the final say, in collaboration with his associates in the corporation and the other stockholders, in the choice of personnel, who would make the picture, including the leading actor and actors, became all-important. Siegel went to New York and Herbert, Abbott and he reached a decision that the best way to make the picture in order to attain these benefits was through a corporate entity. The Jaffe Agency, through Mary Baker, had been Herbert's agents and the attorneys in this case had been his attorneys. When the decision was reached to use the corporate entity, a tax consultant or advisor was retained. Using an expression which had become, current in the early administration of President Franklin D. Roosevelt, these advisors were sometimes referred to as Herbert's "brain trust".

The play was produced in New York by the "Kiss and Tell" company, a co-partnership organized under the laws of that state. This included Herbert, the author, Abbott, the producer, and the financial

backers who had put up the actual cost in producing the play in exchange for an interest in it.

The impact of taxation on the corporate structure was discussed, and there are in the record subsequent letters dated May 21, 1942, and October 13, 1942, in which Jaffe, the agent who is not a tax expert, referred to the New York conversations, and stressed the importance of retaining control of the corporation by the persons who were the partners in the play, not allowing others to enter, and making it possible for all to realize capital gains. But it is to be borne in mind that this was only one of the benefits being discussed. Abbott became convinced that as the producer of the successful play and the owner of a large interest in it, it was to his interest also that any motion picture to be produced from it should have the advantage of control of content, direction and actors by the successful writer and producer. But at all times, the thought was not that a picture would be produced and the company liquidated, but that the picture, if *successful,* would be *followed by other productions.* The discussions went on over a long period of time. Various corporate structures, the possibility of limited partnership and other methods were discussed. Partnerships or joint ventures had the disadvantage of forced dissolution upon the death of a partner, while a corporate entity would provide continuity of existence.

On July 7, 1944, the Abbott-Herbert Corporation, to be referred to as Abbott-Herbert—was organized under the laws of California. The articles of incorporation, executed on July 5, 1944, in fifteen subdivisions set forth the purpose to engage in the production, distribution of motion pictures, radio broadcasting, television, stage plays, with the right to own property ranging from studios down · and to borrow money for any and all purposes. These fifteen clauses were declared to be independent of one another, and not in any way limiting one another. The motion picture to be produced from the play "Kiss and Tell" was not referred to. After some intermediate transfers, the stock of the corporation as of November 1, 1944, stood in this manner:

Kiss and Tell Company—40% of the common stock, plus $200.00 preferred.

George Abbott 10% of the common stock.

F. Hugh Herbert 50% of the common stock plus $300.00 preferred.

In addition to this, the stockholders also purchased preferred stock in Abbott-Herbert in 1944 for cash as follows:

| | |
|---|---|
| Kiss and Tell Company | $20,000.00 |
| George Abbott | 5,000.00 |
| F. Hugh Herbert | 25,000.00 |

Under the community property law of California [23], the plaintiff was the owner of one-half interest in his share of the property and stocks referred to. On August 6, 1944, Abbott-Herbert and the Kiss and Tell Company, a co-partnership, assigned to the corporation their play right and copyright to the play entitled "Kiss and Tell", reserving to themselves only first-class stage rights to the play. The play, at the time, exclusive of the rights not assigned to it, had a mortgage value of $500,000. The motion picture was afterwards produced by Abbott-Herbert and released on or about October 18, 1945.

Compensation to all the persons participating in the production of the picture was paid by the corporation. The corporation borrowed large sums of money, including $400,000 from the Bank of America. In the production of the picture, the corporation paid out of its own checks moneys in excess of $450,000. It paid federal taxes, state taxes, including personal property tax. It paid license fees. Contracts relating to legal accounting, agency and other services were entered into on a percentage basis.

(B) *The Relationship with Columbia Pictures*

23. California Civil Code, Secs. 161(a), 164, 687.

In what has gone before, we have detailed in bold outline the facts as they appear from the documentary evidence and the testimony of Herbert. We have left for separate treatment the relationship between the corporation and Columbia Motion Pictures,—to be referred to as Columbia,—the facilities of which were used in producing the pictures and which had an exclusive contract for its release. This requires separate treatment because the Government makes the curious contention that, notwithstanding the fact that the entire production was under the direction of Abbott-Herbert, who controlled the content of the picture, direction, the starring personality, and whose funds paid for the production, the picture was, in reality, not produced by Abbott-Herbert. The argument impresses one as nebulous. It is as though a large contractor who designed a building, supervised its construction, and completed it, were deprived of the right to claim its "construction" because the work was done by sub-contractors, each of whom did a portion of the work.

An analysis of the facts as they appear in the record will show that, while the facilities of Columbia were used in the production of the picture, the real producer was Abbott-Herbert. The money borrowed from the Bank was on the credit of that corporation, and, while the Bank had Columbia's assurance that the picture would be produced within a certain margin, that does not detract from the fact that, ultimately, it was the Abbott-Herbert Corporation that was responsible for the repayment of the loan for which they received an assignment, in advance, of a percentage of the proceeds. The failure of the picture would have been the failure of the Abbott-Herbert Corporation and not of Columbia. Its moneys would have been lost. And if the incurring of such obligations and risks can be swept aside as mere sham, then the word "corporation" has lost its meaning. In truth, the entire fault of the Government's argument lies in this,—that, because the number of stockholders was limited, and because the corporation acted through the "brain trust", in truth, there was no corporation. This, of course, goes back to the fallacy exposed in the first part of this opinion that mere control deprives the corporation of its independent existence,—a fallacy which the Supreme Court has repeatedly in recent years repudiated.[24]

Now for a few more details about the relationship between Abbott-Herbert and Columbia.

On August 11, 1944, an agreement was entered into between Abbott-Herbert and Columbia. The agreement, in some 77 pages of text plus 15 pages of exhibits, begins in letter form addressed to Abbott-Herbert by Columbia, in which as a preamble it is stated: "You (Abbott-Herbert) represent that you are a California corporation, organized, among other things, for the purpose of producing motion pictures photoplays and that you are at present engaged in the development for production of a photoplay based upon the stage play entitled 'Kiss and Tell'. We desire, in connection therewith, to enter into an agreement relating to the production by you and distribution by us of a photoplay based upon the play 'Kiss and Tell'."

Throughout the entire agreement, the emphasis is on the fact that the production of the picture is by Abbott-Herbert, and

24. See cases in Notes 13 and 14. The California law is to the same effect. See, Erkenbrecher v. Grant, 1921, 187 Cal. 7, 11, 200 P. 641; Continental Securities & Investment Company v. Rawson, 1929, 208 Cal. 228, 237–239, 280 P. 954; Hollywood Cleaning & Pressing Co. v. Hollywood Laundry Service, Incorporated, 1932, 217 Cal. 124, 129–131, 17 P.2d 709; California Employment Commission v. Butte County Rice Growers Ass'n, 1944, 25 Cal.2d 624, 636–637, 154 P.2d 892; Bliss v. California Cooperative Producers, 1947, 30 Cal.2d 240, 253–254, 181 P.2d 369, 170 A.L.R. 1009; Wiseman v. Sierra Highland Mining Company, 1941, 17 Cal.2d 690, 697–698, 111 P.2d 646; Norins Realty Co., Inc., v. Consolidated A. & T. G. Co., 1947, 80 Cal.App.2d 879, 883, 182 P.2d 593. Judelson v. American Metal Bearing Co., 1948, 89 Cal.App.2d 256, 262–263, 200 P.2d 836. The latest California decision on the subject is Consolidated Photographic Industries, Inc., v. Marks, 1952, 109 Cal. App.2d —, 240 P.2d 718.

that Columbia is merely the distributor. As already stated, the personnel of the directors, the stars, the content of the picture, the standard to be followed in order to insure that the picture is suitable for exhibition, are all to be determined by Abbott-Herbert. They are charged with responsibility for enforcing the contracts between the writer and the supervisors. The selection of the cast, the insurance of the cast, the cost of the negative are all to be borne by Abbott-Herbert. They are to prepare the budget, and the approval of Columbia *is not required* unless the budget exceeds $650,000. As to the all-important script approval, while the agreement gives Columbia the right to make comments, suggestions and criticisms, and Abbott-Herbert agrees that they "will give consideration to such suggestions and criticism", these are,—to use the language of probate law.—precatory words. They are not words of command or obligation. In truth, the testimony of one of the executives of Columbia at the trial was that, while they were aware of that right, in reality, they never exercised it. Abbott-Herbert agreed to use the facilities of Columbia, for which charges were to be made, including a staff charge of not to exceed $30,000, and an overhead of not to exceed 23 per cent of all the direct charges. The only responsibility Columbia assumes as to its facilities, is to use reasonable diligence in maintaining the apparatus, cameras and other equipment in good working condition. The obligation to furnish them is suspended if, by reason of fire, strike, lock-out, riot, insurrection, war, unavoidable casualty, act of God, explosion, earthquake, or inability to obtain the facilities or services or other causes beyond their control, prevented it. Columbia is under no liability for injuries to any of the employees or invitees of Abbott-Herbert.

These, which are but a few of the conditions, show conclusively, as the preamble stated, that "the producer" was Abbott-Herbert.

The commitments to the Bank are the same. Under date of October 6, 1944, we have a memorandum from the files of the Vice-President and Manager of the Bank of America, which recites that they have agreed to lend a corporation to be formed by George F. Abbott, F. Hugh Herbert, writer, and Sol Siegel, producer, 60 per cent of the negative cost of a picture to be based on the stage success "Kiss and Tell". The memorandum stated that it was contemplated that the picture would cost not over $750,000. On January 3, 1945, the formal mortgage-pledge or assignment was executed between the bank and Abbott-Herbert. Significantly, the first paragraph recites: "(a) Producer represents that is is fully organized, existing and authorized by law to do business as a corporation in the State of California; that its corporate powers include the making and exploitation of motion pictures; that the transactions contemplated by this agreement, including the borrowings for which provision is made herein, are within its corporate powers; that the loan or loans contemplated by this agreement are authorized by resolution duly and regularly adopted by its Board of Directors of which a certified copy is attached hereto as Exhibit 'A', and is expressly made a part hereof; that its officers who have executed this agreement and who are executing the promissory note or notes which will evidence the loan or loans to be made hereunder are fully empowered so to do."

On the same day, the Bank entered into an agreement with Columbia which referred to Abbott-Herbert as the "producer" and Columbia as the "production and distribution agent." As such, they agreed to withhold for the bank from the income a certain percentage and subordinate themselves on liens to the liens of the loan agreement. The agreement also recited that, as a matter of courtesy, the Bank would furnish them with statements showing the amount advanced. There is in this and other agreements the assurance of Columbia that it will cooperate in seeing that the cost did not exceed the maximum contemplated. Thereafter the proceeds of the loan were turned over to Abbott-Herbert, who paid them out in the production of the picture.

It is inconceivable to us or to any one cognizant of the corporate law of California, that the Bank of America, under these circumstances, could have contended in

court, if the venture had proved a failure, that the loan was made to Abbott and Herbert as individuals.[25] And yet, if the Government's contention is correct, that consequence should follow. For if the entire scheme was merely a fraudulent effort to deceive every one, including the Government, and this joint venture was, in reality a partnership, then the hard-headed Bank of America were also the dupes of the "scheming" writer and producer.

The corporate entity was evident at all times, not only in its relation with others, but in its relation with Herbert. His services as a writer were covered by a contract entered into by the corporation on August 6, 1944, in which the services to be rendered by him in preparing the script and assisting in the production of the picture were described in great detail. As compensation, he was to receive $15,000 when the principal photography began, and $22,500 when funds were available. At no time would Columbia exercise any control over the making of the picture. No executive of Columbia ever walked on the set during the entire making of the picture. And when the President of Columbia wished to visit the set on one occasion, he sent word by "the studio cop" for permission to come on for a few moments. The arrangements for the use of the stars who were borrowed from Columbia and other studios, were conducted by Abbott-Herbert. The picture was completed at a cost of $578,879.23, i. e., below the estimated budget,—as shown by the final cost sheets of Abbott-Herbert.

■ Corporations are inanimate things. And in the "shooting" of the picture, of necessity, the corporation acted through Siegel, Herbert and Abbott. If the corporation had had ten thousand stockholders, they still would have had to act through a small group of persons designated to produce the picture. And the fact that in the particular case, the men active in the production for the corporation were also the controlling stockholders, does not alter the legal effect of their action.

As one examines the voluminous documentary evidence in this case, one is impressed with the meticulousness with which every step that was done was done under the corporate form, every contract executed was preceded by the proper authorization by the Board, and every contract entered into with the Bank and Columbia recited on its face that all the legal requirements needed to fasten liability upon the corporation had been complied with. In fact, they were denominated representations so that the corporation could be bound. If all these were merely matters of form, then, under the law of corporations, Abbott, Herbert and Siegel could have been held liable. Yet it is inconceivable that any one could be successful in fastening liability on them in the face of the actual record, and the assumption by the corporation of the heavy commitments undertaken by them, even those preceding the actual organization of the corporation.[26]

The picture was produced and delivered to Columbia in July of 1945 under the conditions which have just been outlined. This was the culmination of a series of acts which began in 1942, following the success of the stage play. A comparison of dates in which the main facts outlined and the long lapse of time between discussions and performances indicate clearly not only that the selection of the corporate entity was the result of considerations adequate in law for such choice, but that its execution in every particular and the carrying out of one of its objects, the production of the play as a motion picture, were also against a background of corporate structure. These covered every step from the original discussion through the incorporation of the company, its assumption of corporate powers, its borrowing of money from the bank, its contract of distribution with Columbia, its employment of

---

25. See cases cited in Note 24.

26. Biggart v. Lewis, 1920, 183 Cal. 660, 665–667, 192 P. 437; Central Heights Improvement Company v. Memorial Parks, Inc., 1940, 40 Cal.App.2d 591, 105 P.2d 596; MacDonald v. Arrowhead Hot Springs Co., 1931, 114 Cal.App. 496, 300 P. 105; El Rio Oils (Canada) Limited v. Pacific Coast Asphalt Co., Inc., 1949, 95 Cal.App.2d 186, 213 P.2d 1.

the talents of the plaintiff, Siegel and others who supervised in various capacities the production, its selection of director and actors, its complete control of production without any interference on the part of Columbia, its disbursement of the money borrowed, through corporate channels, to those whom it employed, and many other acts evidenced by several thousand pages of corporate documents executed with all the formality and requirements of the corporation law of California, indicate business activity which is sufficient to satisfy not only the requirements of the law of corporations of the State of California [27], but also the *more exacting demands* of the income tax cases.[28]

So the Department was wrong in brushing aside all these facts which were called to its attention and the documentary proof of which was available on inspection of official and corporate records of Abbott-Herbert, Bank of America, Columbia and of the official records of the Department of Corporations of the State of California.

## IV

### The Liquidation of the Corporation

We now come to the dissolution of the corporation and the liquidation of its assets and its effect on the tax exacted.

The Treasury disregarded the official acts of the corporation, performed under California law, in dissolving the corporation and the consequent liquidation of its assets which it authorized. Before discussing the legal implications of these acts, we pick up the narrative where we left it,—the delivery of the completed picture to Columbia.

Between January 1, 1945, and the date of the delivery of the picture, Herbert, Abbott and Siegel discussed the possibility of producing other motion pictures. There was some talk about making a picture from another play of Herbert's, which had been produced by Gilbert Miller, and also of a picture to be written specially for Rita Hayworth. While these discussions were going on, Abbott-Herbert employed Mr. J. J. Milstein who, in addition to his expenses, was to receive a sum equal to two and one-half per cent of the net motion picture receipts of the corporation from the distribution of the motion picture. His function was to render expert advice in relation to the sale, distribution, exhibition and the release of "Kiss and Tell". His function was, as expressed by Herbert in his testimony: "to see that the picture got the best and most advantageous bookings, and to check those bookings, and to organize and implement the proper exploitation for the success of the picture." (Transcript p. 76.)

In other words, he was to see that Columbia, in distributing the picture "got the best financial results." The picture went into pre-release in September, 1945, and general release in October, 1945. And Milstein sent to the corporation reports as to the business the picture was doing, which proved to be very optimistic and led to the feeling that the picture would make a good deal of money. When the picture had been completed, Abbott had a change of heart concerning the desirability of staying in the motion picture business. He was essentially a director and producer of plays, whose successes were in New York. And after the picture had gone into release, Abbott seemed to be no longer interested in other pictures. Herbert, on the contrary, desired to stay in business as an independent producer. He had enjoyed the liberty of action which he had during the making of this picture, and was anxious to continue in that capacity. Even when it was called to Abbott's attention that the corporate tax rate would be lower after January 1, 1946, Abbott said that if the corporation were kept alive, it necessitated further production, which would entail risks in which they might lose the money they were likely to make from the first venture. When it was pressed on Abbott's mind that the expected profit of the first venture might be sufficient to finance another picture, he was still hesitant to risk the funds. As he put it, "Suppose you go ahead and make a picture and it falls on its

27. See cases cited in Notes 24 and 26.

28. See cases cited in Notes 17, 18, 19, 20 and 21.

nose?" As one not familiar with the motion picture field, having produced a picture which gave promise of success, he was unwilling to risk the profits on another venture.

The picture had been released only a short time and very little money was coming in. To buy him out would have involved a large sum of money, which was not available. So the decision was reached to dissolve the corporation. And the proper corporate action was taken to dissolve the corporation voluntarily under the law of California.[29]

The Minutes of the corporation disclose in great detail full compliance with all the requirements as to notice and the agreement upon a method of distributing the assets of the corporation. These covered several meetings during the months of October, November and December of 1945. The final liquidation was accepted on December 1, 1945. On the same day, notices were served on Columbia Pictures detailing the dissolution of the corporation and the distribution of assets with the request and direction that additional moneys due from the exhibition of the picture should be paid to the distributees, including plaintiff, in proportion to their distributive shares of the assets of the corporation.

On February 11, 1946, the plaintiff notified Columbia that monies payable to him, as such distributee, should be paid to Sydney R. Fleisher of New York as his agent. Other distributees of the assets gave similar notices. Columbia accepted these appointments, and has paid the shares of monies derived from distribution coming to the plaintiff and others direct to them, through the agent. It should be added that, at the time of the distribution of the assets of the corporation, the fair market value of the picture, after deducting liens and indebtedness, as shown by competent evidence at the trial, was $973,866.25. The fair market value of the other assets of the corporation was $17,500. There was also cash distributed in the total amount of $26,155.93. In accordance with Section

148(d) of the Internal Revenue Code, 26 U.S.C.A. § 148(d), Form 906 was filed with the Collector of Internal Revenue within 30 days after adoption of the resolution of dissolution and liquidation. And on or before February 15, 1946, there was also filed Information Form 1099L, reporting the fair market value of the pro rata share of the assets distributed in complete liquidation to each shareholder.

In filing his income tax return for 1945, Herbert made a computation determining his long-term capital gain on the liquidation of the corporation on December 1, 1945, under the provisions of Sections 115(c) and 117 of the Internal Revenue Code, 26 U.S. C.A. §§ 115(c), 117. His computation showed a gain of $538,433.13. Of this Herbert reported one-half as his community property and his wife reported the other. On his return for 1946, and subsequent returns, in which he had receipts from the assets, the fair market value of his distributed share, and liquidation was given in the sum of $547,183.13. The Government, ignoring the corporate entity, taxed the venture as a joint venture and asserted a deficiency which Herbert paid on July 18, 1950. A timely claim for refund was made, but not acted on by the Government within six months.

This action was instituted to recover it. The Treasury Department chose to disregard the entire series of corporate acts which we have just delineated.

Can such legal acts be disregarded at will?

Structures chosen by business men for carrying on business, whether they be in the form of partnerships or corporations, postulate mortality. It is assumed that whatever the structure is, it might not go on forever. And it is the established law of this circuit that when a partnership is dissolved, either by the act of the parties, by operation of law, by the death of a surviving party, or by a decree of court after litigation between the partners, the moneys received by the withdrawing partner for his share of the assets, even if pay-

---

29. California Corporation Code, Secs. 4600–4605, 4800–4801, 5000, recodifying former Sections 399–401 of the California Civil Code.

able over a period of years, are *not* income, but distribution of capital assets from which a capital gain or loss results.[30] And when, on voluntary dissolution, under the law, a choice lies between several methods, the taxpayer may choose one which is not taxable. When he makes the choice, it cannot be swept aside by an administrative *fiat.* The thought was expressed very tersely by the Court of Appeals for the Ninth Circuit in a significant case: "Where for legitimate business purposes a person has a choice of conducting his business transactions without tax liability, such a liability does not arise simply because it would have arisen if another process had been chosen." [31]

These cases put into effect the thought expressed by Mr. Justice Holmes when he wrote: "We do not speak of evasion, because, when the law draws a line, a case is on one side of it or the other, and if on the safe side is none the worse legally that a party has availed himself to the full of what the law permits. When an act is condemned as an evasion, what is meant is that it is on the wrong side of the line indicated by the policy if not by the mere letter of the law."[32]

And there is no distinction whether we are dealing with transfers on dissolution of a partnership, or partial sales by corpora-tions, or distribution of its assets in kind by the corporation. The Supreme Court in a very recent case has stated specifically: "a corporation may liquidate or dissolve without subjecting itself to the corporate gains tax, even though a primary motive is to avoid the burden of corporate taxation." [33]

And there is authority preceding this declaration for the proposition that after such distribution, income derived from the property is taxable to the recipient of the distributed share, and not to the corporation.[34] And even the Treasury Regulation recognizes that a corporation has ceased to exist, even though, under state law, it may have a continued existence for certain limited purposes connected with the winding up of its affairs.[35] Here, the corporation went out of existence, the assets were distributed, the corporate books were closed, no corporate act appears on the Minutes subsequent to December 1, 1945.

The Treasury Department recognizes that when this is preceded by a distribution of the assets, no gain or loss is realized by the corporation. The regulations provide: "No gain or loss is realized by a corporation from the mere distribution of its assets in kind in partial or complete liquidation, however they may have appreciated

30. Stilgenbaur v. United States, 9 Cir., 1940, 115 F.2d 283; United States v. Adamson, 9 Cir., 1947, 161 F.2d 942.

31. Commissioner of Internal Revenue v. Kolb, 9 Cir., 1938, 100 F.2d 920, 926; and see, Fulton Oil Co. v. Commissioner, 9 Cir., 1936, 81 F.2d 330, 331; Commissioner of Internal Revenue v. Neaves, 9 Cir., 1936, 81 F.2d 947, 949; Pacific Southwest Realty Co. v. Commissioner, 9 Cir., 1942, 128 F.2d 815, 818; Woodruff v. Commissioner, 5 Cir., 1942, 131 F.2d 429, 430; Wall v. United States, 4 Cir., 1947, 164 F.2d 462, 466.

32. Bullen v. Wisconsin, 1916, 240 U.S. 625, 630–631, 36 S.Ct. 473, 474, 60 L. Ed. 830; and see, Superior Oil Company v. Mississippi, 1930, 280 U.S. 390, 395–396, 50 S.Ct. 169, 74 L.Ed. 504.

33. United States v. Cumberland Public Service Co., 1950, 338 U.S. 451, 455, 70 S.Ct. 280, 282, 94 L.Ed. 251.

34. Helvering v. Horst, 1940, 311 U.S. 112, 118, 61 S.Ct. 144, 85 L.Ed. 75; Seattle Renton Lumber Co. v. United States, 9 Cir., 1943, 135 F.2d 989; Lum v. Commissioner, 3 Cir., 1945, 147 F.2d 356; United States v. Cummins Distilleries Corp., 6 Cir., 1948, 166 F.2d 17, 20; Commissioner of Internal Revenue v. First State Bank, 5 Cir., 1948, 168 F.2d 1004, 1007–1009; Twin Oaks Company v. Commissioner, 9 Cir., 1950, 183 F.2d 385, 387.

35. Regulation 111, Sec. 29.52–1, 26 Code of Federal Regulations, 1949, ed., p. 328. "A corporation is not in existence after it ceases business and dissolves, retaining no assets, whether or not under State law it may thereafter be treated as continuing as a corporation for certain limited purposes connected with winding up its affairs, such as for the purpose of suing and being sued."

or depreciated in value since their acquisition."[36]

And, under the facts in the case, there is no need to resort to another portion of Regulation 111, which states: "If the conduct of the affairs of a corporation continues after the expiration of its charter, or the termination of its existence, it becomes an association." [37]

Nor to the cases which interpret this provision on which the Government relies.[38] In these cases, the trier of facts had found that certain transactions claimed to have been entered into by individual shareholders, to whom an attempted transfer of assets of a corporation had been made, were, in reality, transactions by the corporation. In all, negotiations for the sale of the property had been begun by the corporation or its officials, and although they were later concluded, presumably by individual shareholders, the trier of facts was satisfied that the transactions *had been concluded* as *they had been begun* by the corporation. And the Courts of Appeals, finding evidence to support the conclusion, sustained them. So doing, however, the Courts were governed by the particular facts in each case. They did not lay down the rule that distribution of assets, wholly or partially, upon a dissolution of a corporation under appropriate state law, could arbitrarily be set aside as the Treasury Department would have us do here. Indeed, one of these very cases states the principle already discussed that such distribution, if completed, results in a transfer and is not taxable to the corporation: "It is a well settled principle that a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes, or to avoid them altogether, by means which the law permits. * * * And in some instances that may be the tax-wise result where a corporation makes a bona fide distribution of some or all of its assets as a complete or partial liquidating dividend to its stockholders and the stockholders later make a bona fide sale of the property to a third person. * * * But the distribution as a liquidating dividend and the subsequent sale to the third person must be a bona fide reality in substance as distinguished from the stockholders merely constituting a conduit through which to channel title from the corporation to the ultimate purchaser. In such an instance, the corporation is not liable for the tax on the transaction."[39]

Where such transfer is completed, the subsequent payment of income to the stockholder acquiring the property cannot be taxed as income to the corporation.[40] This

---

36. Regulation 111, Sec. 29.22(a)–20, 26 Code of Federal Regulations, 1949 ed., p. 175.

37. Regulation 111, Subpart (F), Sec. 29.3797–2, 26 Code of Federal Regulations, p. 696.

38. Coast Carton Co. v. Commissioner, 9 Cir., 1945, 149 F.2d 739; Kaufmann v. Commissioner, 3 Cir., 1949, 175 F.2d 28; Jones v. Grinnell, 10 Cir., 1950, 179 F.2d 873; Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981.

39. Jones v. Grinnell, supra, 179 F.2d at page 874.

40. Cases such as Raybestos-Manhattan, Inc., v. United States, 1935, 296 U.S. 60, 56 S.Ct. 63, 80 L.Ed. 44, and United States v. Joliet & Chicago Ry. Co., 1942, 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658, do not apply. In them the Court held that the corporation had merely ordered a dividend payable to another, and, as Mr. Justice Douglas stated in the latter case, "The umbilical cord between it and its shareholders (had) not been cut." United States v. Joliet & Chicago Ry. Co., supra, 315 U.S. at page 49, 62 S. Ct. at page 445.

But where there is a complete transfer of income producing property, the income is taxable to the transferee, *when received*. See, Blair v. Commissioner, 1937, 300 U.S. 5, 12, 57 S.Ct. 330, 81 L.Ed. 465; Helvering v. Horst, 1940, 311 U.S. 112, 117–119, 61 S.Ct. 144, 85 L.Ed. 75; Lum v. Commissioner, 3 Cir., 1945, 147 F.2d 356; Commissioner v. First National Bank of Stratford, 5 Cir., 1948, 168 F.2d 1004, 1007–1008. And where the amount of income is not ascertainable at the time of transfer, expert valuation of the property transferred on a "long-term capital gain" basis, as defined in Sec. 117(a) (4), Internal Revenue Code, may be used to determine value, *as was done here*. See, Commissioner of Internal Revenue v. Carter, 2 Cir., 1948, 170 F.2d 911; Westover v. Smith, 9 Cir., 1949, 173 F.

was the case here. The corporation was dissolved, and its assets distributed in conformity with the laws of the State of California providing for voluntary dissolution of corporations.[41] Under this law, as interpreted by both the state and federal courts when the procedure is completed and the liquidation effected, the corporation ceases to exist as an entity for any and all purposes.[42] Oblivious of consistency, the Treasury Department would have us disregard these rulings interpreting the statute under which the voluntary dissolution of Abbott-Herbert and its consequent liquidation was achieved and would call to its aid the provision of the California law to the effect that when the liquidation is not completed, the directors of the corporation as trustees continue to exercise certain functions.

 The answer to the contention is that here the liquidation *was* completed. It was followed by an assignment of certain percentages of the income to specific shareholders under its contract with Columbia. Columbia *accepted* the transfer and has been paying to the individual stockholders, including Herbert, the income proportionate to the shares of the assets transferred. And the Treasury Department cannot, by the wave of a magic wand, cause to disappear the facts of legal dissolution and complete liquidation. Nor, in the circumstances, can we, as they ask us in the alternative, recognize the dissolution, but deny recognition to the liquidation which followed. The Treasury Department sees the incongruity

of its position, but insists that it "entails no radical departure from established principles." I cannot agree.

While the Treasury Department may take inconsistent views in different cases[43], the position taken here is more than a question of consistency. It would require us to sanction a total disregard by the Treasury Department of a long series of acts of a corporation, done in compliance with state law, in order to deny to a taxpayer the right to regain taxes illegally collected. This, we cannot do merely because these legal acts which the corporation performed resulted in a diminution of tax liabilities. And not until the Supreme Court and the Courts of Appeals repudiate the doctrine promulgated in a long series of cases, dating back to 1874[44], and followed to the present time, can we deny to a taxpayer the right to choose a method of doing business which diminishes his tax liability.

## V

### Deductibility of the Alimony Payments

On May 11, 1937, an interlocutory decree of divorce was entered by the Superior Court of the State of California, in and for the County of Los Angeles, in a case in which Herbert was the plaintiff and Arline L. Herbert, his wife, was defendant. In the decree, the Court approved a property settlement entered into on April 14, 1937, and made the following Order: "It Is Ordered that plaintiff pay to defendant for her support and maintenance the sum of Two Hundred Twenty ($220.00) Dollars

2d 90. A fair valuation in such cases is, as in the case of sale, the value of the property received over the adjusted cost basis. See, Lynch v. Turrish, 1918, 247 U.S. 221, 38 S.Ct. 537, 62 L.Ed. 1087; Pearsall v. United States, 1931, 52 F.2d 1050, 73 Ct.Cl. 187; Boudreau v. Commissioner, 5 Cir., 1943, 134 F.2d 360; Fleming v. Commissioner, 5 Cir., 1946, 153 F.2d 361; Durkee v. Commissioner, 6 Cir., 1947, 162 F.2d 184; compare, Palmer v. Commissioner, 1937, 302 U.S. 63, 68–72, 58 S.Ct. 67, 82 L.Ed. 50.

41. See cases cited in Note 29.

42. Crossman v. Vivienda Water Co., 1907, 150 Cal. 575, 580–581, 89 P. 335; Bank

of Alameda County v. McColgan, 1945, 69 Cal.App.2d 464, 472, 159 P.2d 31; Trubowitch v. Riverbank Canning Company, 1947, 30 Cal.2d 335, 345–346, 182 P.2d 182; Buzard v. Helvering, 1935, 64 App.D.C. 268, 77 F.2d 391; United States v. Safeway Stores, 10 Cir., 1944, 140 F.2d 834.

43. Thus, in United States v. Adamson, 9 Cir., 1947, 161 F.2d 942, it actually urged me to repudiate a decision by the Court of Appeals for the Ninth Circuit, made only seven years before. Stilgenbaur v. United States, 9 Cir., 1940, 115 F.2d 283.

44. See cases cited in Notes 5 and 6.

per month, payable in installments of One Hundred Ten ($110.00) Dollars each, on the first and fifteenth days of each and every month, commencing May 15, 1937, provided, however, that commencing October 15, 1938, upon the condition that defendant shall perform the provisions mentioned in Paragraph First of said property settlement agreement, Page Two, Lines twelve to thirty inclusive, and for so long as she 'shall continue to comply with said provisions, plaintiff shall pay to defendant an additional Eighty ($80.00) Dollars per month, in semi-monthly installments of $40.00 each."

On December 23, 1941, following a modified agreement executed by the parties, the Court entered an order worded as follows: "In lieu of any and all payments which would otherwise be payable from the plaintiff to the defendant and in full discharge of any obligation on the part of the plaintiff to the defendant for her support and maintenance the sum of $300.-00 each on the first and fifteenth days of each and every month, commencing December 1st, 1941, which monthly payments shall continue for a period of five years and after December 1st, 1941, to-wit, to and including November 30th, 1946, but not thereafter."

■■■ Herbert claimed the payments made under these orders for the years in question as allowable deductions as "periodic payments" under the Internal Revenue Code.[45] The object of these provisions introduced by the law of 1942 was to do away with the apparent injustice[46] under which a man divorced from his wife and ordered by a court to support her, was not allowed to deduct the amounts paid from his income tax.[47] The obligation to pay derives not from the agreement of the parties, but from the order of the court, as the section just referred to clearly indicates. And courts have declined to recognize for this purpose voluntary agreements not made obligatory by court decree.[48]

■■■ Under California law, after the decree approving the agreement is entered, the force of the obligation stems from the decree.[49]

Both the section and the regulation distinguish between "installment payments" which are includible in the husband's return and "periodical payments" which are not includible. The section defines installment payments in this manner: "Installment payments discharging a part of an obligation *the principal sum of which is,* in terms of money or property, *specified* in the decree or instrument shall not be considered periodic payments for the purposes of this subsection.[50] (Emphasis added.)

The regulation contains this definition: "(c) Alimony installment payments: (1) In general installment payments discharging a part of an obligation *the principal sum of which is* in terms of money or property *specified in the decree* of divorce or legal separation, or in an instrument incident thereto, are not considered 'periodic payments' and therefore are not to be in-

45. Internal Revenue Code, Secs. 22(k) and 23(u), 26 U.S.C.A. §§ 22(k), 23(u).

46. Douglas v. Willcuts, 1935, 296 U.S. 1, 8, 56 S.Ct. 59, 80 L.Ed. 3; Helvering v. Fitch, 1940, 309 U.S. 149, 151, 60 S. Ct. 427, 84 L.Ed. 665.

47. The legislative history indicates this purpose. See, Senate Report No. 1631, Committee on Finance, 77th Congress, 2nd Sess., pages 83–86; House Report No. 2233, Committee on Ways and Means, 77th Congress, 2nd Sess., pages 46, 71–74. See, Cox v. Commissioner, 3 Cir., 1949, 176 F.2d 226, 228.

48. Smith v. Commissioner, 2 Cir., 1948, 168 F.2d 446; Daine v. Commissioner, 2 Cir., 1948, 168 F.2d 449; Cox v. Commissioner, supra, note 47; Commissioner v. Walsh, 1949, 86 U.S.App.D.C. 365, 183 F.2d 803.

49. California Civil Code, Sec. 139, Henzgen v. Henzgen, 1944, 62 Cal.App.2d 214, 217–218, 144 P.2d 428; Hough v. Hough, 1945, 26 Cal.2d 605, 609–614, 160 P.2d 15; Howarth v. Howarth, 1947, 81 Cal.App.2d 266, 183 P.2d 670; Price v. Price, 1948, 85 Cal.App.2d 732, 735–738, 194 P.2d 101; Shogren v. Superior Court, 1949, 93 Cal.App.2d 356, 358, 209 P.2d 108.

50. Internal Revenue Code, Sec. 22(k), 26 U.S.C.A. § 22(k).

cluded under section 22(k) in the wife's income." [51]

█ Ordinarily, it might be difficult to draw a distinction between periodic payments and installment payments. For periodic payments may imply merely payments over a period of time. So may installment payments. But the Congress and the Treasury Department make it clear that "periodic" payments are payments made at different times, which, as to amount or duration, are indefinite. Installments, on the other hand, are payments made periodically of amounts, equal or unequal, as portions of a definite and established whole. And this is what is meant by the phrase contained both in the section and the regulation that the "principal sum * * * is, in terms of money or property, specified in the decree of divorce or legal separation, or in an instrument incident thereto."

█ The Court of Appeals for the Fifth Circuit has stated the object of these subsections in this manner: "The theory of the subsections is that the wife shall pay tax on what she periodically receives from the husband in money or property. If he pays money, it will ordinarily be from his taxed income, and he is granted a deduction to avoid double taxation to him and his former wife." [52]

And where, under a modification of a divorce decree, on a husband's representation that he would prefer to make a bulk settlement, the Court ordered the husband to pay $15,000 in cash and ten yearly installments of $1,500, the Court held that the amounts were not "periodic" payments but "installments" and not deductible by the

husband. "We believe that Section 22(k) of the Internal Revenue Code and Regulations 111, Section 29.22(k)–1 (c), promulgated pursuant thereto require the conclusion that the $15,000 and $1,500 payments were 'installment' payments not in conformance with the definition of 'periodic payments' and therefore neither includible as income by Elizabeth nor deductible by Peter." [53]

And, generally, it has been held that where the total amount of the obligation was *not* stated or could not be ascertained by computation because the amount of the monthly payment differed with the husband's earnings[54], or, although a monthly payment was fixed, no total amount could be determined because the payments were conditioned on the wife's life, the payments were "periodic" payments.[55] This because, in such cases, there is no "principal sum". But where the total amount of payment was expressed in the order of the court or the payments were limited to a definite period of years, they were "installments".[56] And this is true even though the payments are terminable upon the death or remarriage of the wife.[57]

█ The original decree of divorce entered in this case called for the payment of $220 per month until the wife remarried, secured employment or died. There was also the promise to pay an additional sum of $80 per month if she conducted herself properly. The modified decree substituted for these payments, dependent on certain contingencies, a *definite obligation* to pay the sum of $300 a month for a period of five years from and after December 1,

51. Reg. 111, Sec. 29.22(k)–1(c)–1, 26 Code of Federal Regulations, p. 207.

52. Pappenheimer v. Allen, 5 Cir., 1947, 164 F.2d 428, 430. See, Laughlin's Estate v. Commissioner, 1948, 9 Cir., 167 F.2d 828.

53. Van Vlaanderen v. Commissioner, 3 Cir., 1949, 175 F.2d 389, 390–391.

54. Young v. C. I. R., 1948, 10 T.C. 724; Lee v. C. I. R., 1948, 10 T.C. 834.

55. Laughlin's Estate v. Commissioner, supra, Note 52. In Lee v. C. I. R., supra, Note 54, 10 T.C. at page 831, the Tax

Court states: "If a husband were required to pay $200 per month for life the total amount could be calculated by the use of a formula involving mortality tables, *yet such payments would clearly be periodic* and not installment payments."

56. Carmichael v. C. I. R., 1950, 14 T.C. 1356; Fleming v. C. I. R., 1950, 14 T.C. 1308; Steinel v. C. I. R., 1948, 10 T.C. 409; Casey v. C. I. R., 1949, 12 T.C. 224.

57. Orsatti's Estate v. C. I. R., 1949, 12 T.C. 188.

1943, to and including November 30, 1946. The Order specifically provided that the remarriage of the wife "shall not affect the amount or duration" of the payments and that the payments should cease on December 1, 1946, "whether or not the defendant shall have remarried".

In the light of what has just been said, the amounts paid by Herbert to the wife in 1945 and 1946 under the modified decree were clearly "installments" paid in satisfaction of a legal obligation, the amount of which was definitely fixed by the decree.[58] The Treasury Department was, therefore, right in not allowing the claimed deductions on this account.

## VI

### Disallowance of Improvements

There remains to be considered the disallowance of the cost of permanent improvements on Herbert's personal residence at 128 North Hayworth Avenue, Los Angeles, California. This was purchased in 1927, at a cost of $13,500. It was separate property which Herbert sold in 1946. The net proceeds of the sale were $23,549.68.

Herbert claimed that he expended $11,000 in permanent improvements to the residence and asked that this amount be taken into consideration as the adjusted basis for determining gain under the Internal Revenue Code.[59]

The allowance was rejected. The only objection which the Treasury Department offers to the claim seems to be that "they are not satisfied with the proof." Due to the lapse of time Herbert did not produce bills or receipts showing the expenditures made. But he testified without contradiction that the expenditures made from the time of purchase to the time of sale were in excess of $11,000. (Transcript, pages 107–109).

Any one familiar with improved residential property in Los Angeles, knows that a residence which was purchased in 1927 or 1928, for $13,000 could not possibly have been sold, *as a residence,* almost twenty years later for a net of $23,459.68, unless valuable improvements had been made. The burden was on Herbert to show that he made the improvements. But we are not

58. As we are dealing with a federal statute, the terminology under discussion must be interpreted in the light of federal law and the legislative intent manifested in the enactment. See, Board of County Commissioners of Jackson County v. United States, 1939, 308 U.S. 343, 351–353, 60 S.Ct. 285, 84 L.Ed. 313; Holmberg v. Arnbrecht, 1946, 327 U.S. 392, 395–398, 66 S.Ct. 582, 90 L.Ed. 743. The legislative history is not very revealing. A House Committee (House Committee on Ways and Means, 1942, 2 C.B. 372409) used the expression "lump sum obligations" to cover both types of payments. But the bill in its final form, and the regulations under it, gave different meanings to the words. Regardless of legislative intent, the legislator speaks to the Court through the terminology which he adopts in the final legislation. At times, it may be contrary to the expressed intent because the words chosen do not express such intent. Mr. Justice Robert H. Jackson of the Supreme Court, in a noted address some years ago, warned against resort to legislative history as to final meaning. He repeated Holmes' well-known statement that "we do not inquire what the legislators meant, but

ask only what the statute means". And he added: "And, after all, should a statute mean to a court what was in the minds but not put into the words of men behind it, or should it mean what its language reasonably conveys to those who are expected to obey it?" Robert H. Jackson, Problems of Statutory Interpretations, 1949, 8 F.R.D. 121, 124.

And it is quite evident that, regardless of contract, the Congress intended that deductibility or non-deductibility shall be dependent on the legal obligation which ultimately compels the payment,—i. e., the Court decree. See, Commissioner of Internal Revenue v. Murray, 2 Cir., 1949, 174 F.2d 816, 817. In the case just cited, Judge Learned Hand states that the fact that the terms of the decree originated in contract does not stand in the way of the Court's power to modify it. This accords with the California cases cited in Note 49. But the right to modify in the future is too uncertain to change a definite obligation, such as was substituted here by the modified decree, into an unascertained sum.

59. Internal Revenue Code, Sec. 113(b), 26 U.S.C.A. § 113(b).

permitted to disregard the unrefuted testimony of a reputable witness *merely because he is a taxpayer*. Indeed, on a similar occasion, when the Board of Tax Appeals rejected the positive testimony of a witness as to expenditures which had gone into improvements and extensions of a plant, the Court of Appeals of the Fourth Circuit overturned the finding, saying: "There is no suspicion of bad faith on part of petitioner, nor is there anything in the record that would justify such suspicion."[60]

The testimony of *one credible witness* as to a fact, if not contradicted, and if not inherently improbable, is sufficient to establish such fact.[61] The principle obtains in the law of taxation.[62]

It follows that the Treasury Department was wrong in denying the adjustment to basis to which Herbert was entitled.

Judgment will, therefore, be for the plaintiffs, the exact amounts to be computed by counsel in accordance with the provisions of Local Rule 7(h). Proper orders will be entered in each of the three cases.

---

60. Franklin Lumber & Power Co. v. Commissioner, 4 Cir., 1931, 50 F.2d 1059, 1060.

61. Chesapeake & Ohio Railway Co. v. Martin, 1931, 283 U.S. 209, 216–217, 51 S.Ct. 453, 75 L.Ed. 983; Pennsylvania Railroad Co. v. Chamberlain, 1933, 288 U.S. 333, 340–341, 53 S.Ct. 391, 77 L.Ed. 819.

62. Foran v. Commissioner, 5 Cir., 1948, 165 F.2d 705. And see case cited in Note 60.