MIGUEL C. GODREAU DUFFAU, ET AL., ETC., querellantes y apelados, v. TESORERO DE PUERTO RICO, querellado y apelante.

Número 10822.
*Sometido:* 5 de mayo de 1953. *Resuelto:* 7 de diciembre de 1954.

*Hon. Secretario de Justicia José Trías Monge* (*J. B. Fernández Badillo, Secretario de Justicia Interino,* en el alegato) y *J. C. Santiago Matos, Procurador Auxiliar,* abogados del apelante; *Leopoldo Tormes García,* abogado de los apelados.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del Tribunal.

Godreau, Godreau & Cía., una sociedad, liquidó y distribuyó su activo—principalmente la Central Caribe—entre sus socios en partes proporcionales. Más tarde todos los ex socios comparecieron individualmente en una escritura por la que vendieron dicha Central Caribe por la suma de $625,000 a la Central Aguirre Sugar Company, en adelante llamada "la Aguirre". El Tesorero notificó a los anteriores miembros de la referida sociedad una deficiencia en la contribución sobre ingresos de ésta. Su teoría era que la venta había sido hecha en sustancia por la sociedad antes de su disolución y no por los ex socios en su carácter individual después de la disolución. Por consiguiente, según el Tesorero, la sociedad venía obligada a pagar contribución de ingresos sobre la suma de $324,750.08, el supuesto beneficio que obtuvo la sociedad en la venta. Luego de celebrada una vista en los méritos, el anterior Tribunal de Contribuciones dictó sentencia a favor de los contribuyentes. El caso se encuentra ante nos en apelación interpuesta por el Tesorero contra dicha sentencia.

La cuestión que se nos presenta es si este caso se rige por el de *Comm'r* v. *Court Holding Co.,* 324 U. S. 331, o por el de *United States* v. *Cumberland Pub. Serv. Co.,* 338 U. S. 451. En el caso de *Court Holding Co.,* una corporación negoció con el comprador los términos de la venta de una casa de apartamientos, su único activo. *Se llegó a un convenio oral con respecto a los términos y condiciones de la venta.* Durante una reunión de las partes con miras a poner el convenio por escrito, el abogado de la corporación advirtió al comprador que la venta no podía llevarse a efecto porque ello traería como resultado la imposición de una fuerte contribución sobre ingresos a la corporación. Al día siguiente la corporación de-

claró un "dividendo de liquidación", que representaba la liquidación total de su activo, traspasándose la casa de apartamientos a los dos accionistas de la corporación. Se redactó un contrato entre los dos anteriores accionistas y el comprador comprendiendo sustancialmente los mismos términos y condiciones previamente convenidos para la venta de la casa de apartamiento. *La suma de mil dólares, ya pagada a la corporación por el comprador, fué abonada al precio de venta como pago parcial.* Tres días después, se entregó la propiedad al comprador.

La Corte Suprema de los Estados Unidos resolvió el caso empleando el lenguaje siguiente a las págs. 333-4:

"La Corte de Contribuciones concluyó de estos hechos que, no obstante la declaración de un 'dividendo de liquidación' seguida de los traspasos del título, la corporación no había abandonado las negociaciones de venta; que éstas eran meras formalidades dirigidas 'a que la transacción apareciera una cosa distinta a lo que realmente era' con el fin de evitar responsabilidad contributiva. La Corte de Circuito de Apelaciones entresacando distintas inferencias de los autos, resolvió que la corporación había 'deshecho' la venta y consideró la venta de los accionistas como ajena a las negociaciones anteriores.

"Hubo prueba en apoyo de las conclusiones de hechos de la Corte de Contribuciones, y por consiguiente los tribunales deben aceptarlas. *Dobson* v. *Commissioner, 320* U. S. 489; *Commissioner* v. *Heininger,* 320 U. S. 467; *Commissioner* v. *Scottish American Investment Co.,* 323 U. S. 119. A base de dichas conclusiones, la Corte de Contribuciones estuvo justificada en atribuirle a la corporación demandada la ganancia procedente de la venta. La incidencia de la contribución depende de la sustancia de una transacción. Las consecuencias contributivas que surgen de beneficios provenientes de una venta de bienes no se determinan en última instancia únicamente por los medios utilizados para traspasar el título legal. Más bien, la transacción debe considerarse en un todo, y cada paso, desde el inicio de las negociaciones hasta que se lleva a cabo la venta, es pertinente. Una venta hecha por un individuo no puede transformarse para fines contributivos en una venta hecha por otro, usando a éste como conducto a través del cual se pasa el título. Permitir que la verdadera naturaleza de una transacción sea disfrazada con meros

fcrmalismos, que sólo existen para alterar responsabilidades contributivas, menoscabaría seriamente la efectiva administración de las normas contributivas del Congreso.

"Se sostiene que la corporación demandada nunca otorgó un contrato escrito, y que un convenio oral para vender tierras no puede hacerse cumplir en Florida debido al Estatuto contra Fraudes, Comp. Estatutos Generales de Florida, 1927, tomo 3, sec. 5779. Pero el hecho de que la propia corporación demandada nunca otorgara un contrato escrito carece de importancia, toda vez que la Corte de Contribuciones concluyó de los hechos de toda la transacción que la venta consumada fué en sustancia la venta de la corporación. Se revoca la decisión de la Corte de Circuito de Apelaciones y se confirma la de la Corte de Contribuciones."

Hubo considerables críticas contra el lenguaje y el resultado del caso de *Court Holding Co.* (¹) Y la Corte aclaró sus puntos de vista en el caso de *Cumberland Public Service Co.* En dicho caso una corporación, llegando a la conclusión que debía dejar de hacer negocios, ofreció vender sus acciones a una cooperativa. Ésta rehusó comprar las acciones, pero ofreció comprarle el activo físico. *La corporación rechazó la oferta porque hubiera venido obligada a pagar una fuerte contribución por ganancias capitalizables.* Al mismo tiempo los accionistas, deseando economizarse el pago de la contribución de la corporación por las ganancias capitalizables, ofrecieron adquirir el activo físico de la corporación, y luego venderlo a la cooperativa. Ésta aceptó. La corporación transfirió su activo físico a sus accionistas en liquidación parcial.

(¹) Magill, *Sales of Corporate Stock or Assets*, 47 Col.L.Rev. 707; Holzman, *Commissioner* v.*Court Holding Company Who Makes the Sale?*, 27 Taxes 538; Emery, *Liquidating Distributions by Corporations Preceding Sale of Assets*, 27 Taxes 1057; Seghers, *Purchase and Sale of a Business or its Assets*, 26 Taxes 1165; King, *Sale of Stock or Purchase of Assets*, 4 Tax.L.Rev. 378; Freeland, *Recent Trends in the Court Holding Company Principle, Seventh Annual Institute on Federal Taxation*, N.Y.U. 369; Beck, *Newer Methods Designed to Avoid the Court Holding Company Problem. Does a Case Like Westover v. Smith Eliminate the Court Holding Company Problem?, Eighth Annual Institute on Federal Taxation*, N.Y.U. 955; Bierman, *Corporate Distributions of Appreciated and Depreciated Property: Gain or Loss to the Distributor*, Id., 792; *Note*, 63 Harv.L.Rev. 483.

El activo restante se vendió y se disolvió la corporación. *Entonces los accionistas llevaron a efecto la venta anteriormente contemplada a la cooperativa.*

Se radicó en la Corte de Reclamaciones un pleito para recobrar la contribución impuesta a la corporación que en última instancia llegó a la Corte Suprema de los Estados Unidos. Ésta dispuso del caso a las págs. 453–6 como sigue:

". . . La Corte de Reclamaciones concluyó que el método mediante el cual los accionistas dispusieron de los bienes fué manifiestamente escogido para rebajar las contribuciones, pero que la liquidación y disolución de la corporación genuinamente finalizaron sus actividades y existencia. Concluyó además la corte que la corporación en ningún momento planeó efectuar ella misma la venta de sus bienes. Por consiguiente, encontró probado que la venta fué hecha por los accionistas y no por la corporación, y dictó sentencia a favor del recurrido. Un juez disintió, considerando que nuestra opinión en *Commissioner* v. *Court Holding Co.*, 324 U. S. 331, hacía necesaria una conclusión al efecto de que fué la corporación quien realizó la venta en cuestión. Se expidió un auto de certiorari, 338 U. S. 846, para esclarecer toda duda que surgiera de la decisión en el caso de *Court Holding Co.*

"Basamos nuestra decisión del caso *Court Holding Co.* en las conclusiones de hecho de la Corte de Contribuciones al efecto de que se había llevado a cabo una venta y la corporación contribuyente había obtenido ganancias. En dicho caso la corporación había negociado la venta de su activo y efectuó un contrato verbal de venta. Cuando tardíamente se percibieron las consecuencias contributivas de la venta corporativa, la corporación intentó desistir de ésta a última hora procediendo a distribuir las propiedades en sí entre sus accionistas. Éstos, inmediatamente transfirieron dichas propiedades a las mismas personas que habían negociado con la corporación. Los términos de la venta fueron igual, en sustancia, a los habidos en el anterior contrato verbal con la corporación. Mil dólares pagados ya a esta última fueron acreditados como pago parcial del precio de la venta. La Corte de Contribuciones concluyó que la corporación, de hecho, nunca había abandonado sus negociaciones de venta, que ésta nunca fué disuelta, y que el único propósito de la llamada liquidación fué disfrazar una venta corporativa mediante el uso de meras formalidades con el fin de evitar responsabilidad contributiva. La Corte de Apelaciones del Circuito apreció la evidencia de distinto modo. En dicha corte, el Gobierno sostuvo que la determinación

de si una distribución por virtud de una liquidación era genuina o una mera simulación constituye tradicionalmente una cuestión de hecho. Estuvimos de acuerdo con dicha contención, y reexpusimos las conclusiones de hecho y sentencia de la Corte de Contribuciones. Al discutir la evidencia que sirvió de base a las conclusiones de hecho, continuamos diciendo que 'la incidencia de la contribución depende de la sustancia de una transacción' independientemente de 'meras formalidades', y que las contribuciones que se imponen en una venta corporativa no pueden ser evitadas haciendo uso de los accionistas como 'conducto a través del cual se pasa el título.'

"No significa esto que a la corporación se le pueden imponer contribuciones aun cuando la venta haya sido hecha por sus accionistas luego de una liquidación y disolución genuinas. Si bien la diferencia entre las ventas hechas por una corporación, comparadas con la distribución de sus propiedades en sí a los accionistas vendedores de las mismas, pudiere ser particularmente ambigua y artificiosa cuando se trata de una corporación de familia, el Congreso ha optado por reconocer esa diferencia para fines contributivos. Tenemos por consiguiente que la contribución corporativa se dirige primordialmente hacia las ganancias de un negocio en marcha. Ello es cierto a pesar del hecho de que las ganancias de ventas corporativas pagan contribución, para evitar quizás la evasión de contribuciones, aun en los casos en que los beneficios al contado se distribuyan inmediatamente en la liquidación. Pero el Congreso no ha impuesto contribuciones sobre distribuciones por liquidación en sí ni sobre disolución, independientemente del motivo de tal liquidación. Por consiguiente, una corporación puede liquidar o disolverse sin someterse al pago de contribución sobre ganancias corporativas, aun cuando una razón primordial sea evitar la carga de una contribución corporativa.

"En el caso de autos, y basándose en conclusiones de hechos subsidiarias adecuadas, la Corte de Reclamaciones ha concluído que la venta en cuestión fué hecha por los accionistas y no por la corporación. El argumento del Gobierno al efecto de que los accionistas sirvieron como un mero 'conducto' para que la corporación recurrida llevara a cabo su venta se destruye ante esta conclusión. La conclusión subsidiaria de que uno de los principales motivos de los accionistas fué el rebajar sus contribuciones no impide llegar a esta conclusión principal. No importa cuál pudiera ser el motivo y no importa cuán pertinente pudiera ser

al determinar si la transacción fué en efecto real o ficticia, las ventas de bienes físicos por los accionistas seguidas de una distribución genuina en liquidación no pueden atribuírseles a la corporación con fines contributivos.

"Las peculiaridades en las consecuencias contributivas que surgen de las disposiciones sobre contribuciones que aquí predominan, parecen ser inherentes al actual patrón contributivo. Esto es así porque le impone contribución a una corporación si vende todas sus propiedades físicas y distribuye el producto en metálico como dividendos en liquidación, y sin embargo no se le impone contribución si dichos bienes son distribuídos en sí y luego vendidos por los accionistas. En ambos casos el interés de los accionistas en el negocio ha sido transferido al comprador. Nuevamente, si dichos accionistas hubiesen tenido éxito en su esfuerzo original para vender todas sus acciones, sus intereses hubieran sido transferidos a los compradores con la misma efectividad. Sin embargo, en tal transacción la corporación no hubiera obtenido ninguna ganancia tributable.

"Habiendo determinado el Congreso que diversas consecuencias contributivas habrán de surgir de diversos métodos mediante los cuales los accionistas de una corporación familiar puedan disponer de los bienes corporativos, aceptamos su mandato. Incumbe al tribunal sentenciador, luego de considerar toda la transacción, el determinar la categoría a que pertenece una transacción específica de acuerdo con los hechos de la misma. Aquí, como en el caso de *Court Holding Co.*, aceptamos las conclusiones definitivas de hecho del tribunal sentenciador. . . ."(²)

El problema aquí envuelto es determinar si bajo los hechos de este caso, a la luz de los dos casos anteriores de la Corte Suprema, la venta de la Central Caribe a la Aguirre fué en sustancia hecha por la Sociedad antes de su disolución, tra-

---

(²) El efecto del caso de *Cumberland Public Service Co.*, sobre el caso de *Court Holding Co.* se discute en Gutkin y Beck, *Sale of Assets Received in Liquidation*, 28 Taxes 328; Molloy, *Some Tax Aspects of Corporate Distributions in Kind*, 6 Tax L.Rev. 57, 65–6; Carson, *Relations between the Corporation and its Stockholders*, 30 Taxes 551, 558; Cary, *The Effect of Taxation on Selling Out a Corporate Business for Cash*, 45 Ill.L.Rev. 423, 430–8; 2 Mertens, *Law of Federal Income Taxation*, 1954 Supp., págs. 386–95; 1 Rabkin y Johnson, *Federal Income, Gift and State Taxation* págs. 2328–36; 3 Federal Tax Service, Prentice–Hall, 1953, págs. 28, 220 *et seq.;* Riehm, *Federal Taxation Perspective During the Fifth Decade*, 52 Mich.L.Rev. 941, 953; 36 Va.L.Rev. 399.

yendo como resultado un beneficio tributable de $324,750.08 a la sociedad; o, por el contrario, si la venta fué de hecho efectuada por los ex socios de la sociedad luego de disolverse ésta, con el resultado de que la sociedad no obtuvo beneficio tributable alguno.

Los documentos formales en el caso sostienen la posición de los contribuyentes al efecto de que la venta se hizo por los anteriores miembros una vez disuelta la sociedad, y no por ésta antes de su disolución.  El libro de actas de la sociedad demuestra que en una reunión celebrada el 14 de junio de 1946 la Junta de Socios acordó por unanimidad solicitar de la Comisión de Servicio Público que se le permitiera a la sociedad entregar la franquicia expedídale bajo la Ley núm. 221, Leyes de Puerto Rico, 1942, como empresa de servicio público para moler cañas de azúcar, y que tan pronto como fuere posible se reuniera de nuevo la Junta a fin de dar los pasos necesarios para la disolución de la sociedad.  El 23 de septiembre de 1946 en la reunión anual de la Junta de Socios, se informó a éstos que el 15 de agosto de 1946 la Comisión había autorizado a la sociedad a cesar en sus actividades como empresa de servicio público y a entregar su franquicia para molienda de cañas.  Entonces la Junta aprobó por unanimidad una resolución al efecto de que toda vez que el fin primordial para el cual se creó la sociedad había dejado de existir, ésta debería disolverse y su activo ser distribuído entre sus miembros proporcionalmente.  Esto se hizo a tenor con la disposición de la escritura original creando la sociedad de que ésta podía disolverse solamente por acuerdo unánime de todos sus miembros.

El 8 de octubre de 1946 todos los socios firmaron una escritura de disolución de sociedad declarando a ésta disuelta a partir de dicha fecha.  La escritura adjudicó a cada socio su parte proporcional en el activo de la sociedad, incluyendo la Central Caribe.  El 15 de octubre de 1946 los ex miembros de la sociedad concurrieron en una escritura en la cual cada uno

vendía a la Aguirre su participación en la Central Caribe por precios proporcionales que sumaban en total $625,000.

El Tesorero sostiene, sin embargo, que estos documentos formales no reflejan lo que realmente ocurrió. Y se queja de la forma en que el Tribunal de Contribuciones apreció—o dejó de tomar en cuenta—la prueba que había en el caso aparte de los documentos formales. Afirma que el Tribunal de Contribuciones cometió error (1) al concluir que no había prueba de que la sociedad en momento alguno hiciera gestiones para venderle la central a la Aguirre y (2) al no darle efecto a cierta evidencia documental que, según el Tesorero, demostraba que la venta había sido convenida sustancialmente por las partes antes de la disolución de la sociedad.

El Tesorero descansa en ciertas cartas. La primera tiene fecha de 2 de julio de 1946 y en ella el Lic. Tormes le escribió al abogado de la Aguirre que le estaba enviando un memorándum que él había ". . . preparado sobre las personas que hoy forman la sociedad Godreau, Godreau & Cía. dueña de la Central Caribe radicada en Salinas, de modo que puedas ir copiando datos para cuando llegue el momento de firmar los documentos de venta de la factoría perteneciente a dicha sociedad, teniendo en cuenta las disposiciones que contiene el contrato social de la misma." Esta carta también decía que la Comisión de Servicio Público había señalado el 29 de julio de 1946 para la vista de la petición de la sociedad para que se le permitiera dar por terminado su negocio de molienda de cañas.

La segunda carta, fechada el 13 de septiembre de 1946, era también del Lic. Tormes al abogado de la Aguirre. En ella indicaba Tormes que le enviaba copia certificada de una escritura de la cual se desprendía que la sociedad era la dueña de los terrenos en los cuales radicaba la Central Caribe. También decía que "Sería conveniente que nos reuniéramos, el Sr. Rosaly, y los representantes de Central Aguirre Sugar Co., ustedes, y los representantes de los Sres. Godreau y yo, para ultimar lo relativo a la documentación a extenderse y el

pago por parte de la Central Aguirre Sugar Co. a los señores Godreau del precio de la venta de dicha Central." (Entre paréntesis debe indicarse que de los autos surge que esta reunión nunca se llevó a efecto debido a compromisos previos que impidieron a las partes reunirse.)

En tercer lugar se presentó cierta correspondencia cursada a fines de septiembre de 1946 entre la Aguirre y un vendedor de maquinaria demostrativa de que la Aguirre había convenido hacerse cargo de ciertos materiales que la sociedad había ordenado anteriormente pero que no habían sido aún entregados por el vendedor. El Tesorero también descansa en el hecho de que entre el 23 y 26 de septiembre de 1946 la Aguirre compró a la sociedad las piezas en inventario.

El anterior Tribunal de Contribuciones concluyó como cuestión de hecho que la venta se efectuó por los ex miembros de la sociedad luego de disuelta ésta, y no por dicha sociedad antes de su disolución. No podemos convenir en que la evidencia documental en que descansa el Tesorero nos obliga a dejar sin efecto esta conclusión de hecho. El Lic. Tormes declaró que sus cartas fueron escritas en representación de los miembros individuales y no a nombre de la sociedad. Dicho abogado, los contadores, otros abogados, administradores, miembros de la sociedad y representantes de la Aguirre declararon de manera uniforme que las negociaciones que culminaron en la venta se llevaron a efecto entre la fecha de disolución y la fecha de otorgamiento de la escritura de venta. El anterior Tribunal de Contribuciones aparentemente dió crédito a esta prueba. Las cartas del Lic. Tormes a lo sumo demuestran que hubo algunas negociaciones preliminares antes de la disolución. Pero no contradicen necesariamente su declaración de que actuaba en representación de un miembro individual y no a nombre de la sociedad.

La otra prueba en que descansa el Tesorero—la correspondencia en cuanto a las órdenes de suplidores y la compra por la Aguirre de las piezas en inventario—de igual manera no es concluyente. La Aguirre pudo concebiblemente haber lle-

vado a efecto estas gestiones (1) bien sea para obtener aque-
llos materiales para sus otras centrales durante el período de
guerra cuando aquéllos escaseaban (2) o en la esperanza de
comprarle en última instancia la Central Caribe a los ante-
riores miembros de la sociedad. En igual forma, el hecho de
que la central obtuviera la cancelación de su franquicia para
la molienda de caña no es un factor decisivo en este caso.
Éste era un paso necesario antes de la disolución. Pero el
hecho de que la sociedad ya estuviera haciendo gestiones para
su disolución en julio de 1946 no constituye necesariamente
prueba tanto de que había resuelto vender la Central Caribe
como de que había convenido hacerle tal venta a la Aguirre.
De esto surge que nada hay en los autos que nos autorice a
dejar sin efecto la conclusión de hechos de que no hubo nego-
ciaciones a nombre de la sociedad para la venta de la Central
Caribe a la Aguirre.

Además, aún si supusiéramos—como sostiene el Tesorero y
contrario a la conclusión de hecho del anterior Tribunal de
Contribuciones—que antes de su disolución o la sociedad había
negociado para la venta de la Central a la Aguirre o bajo las
circunstancias las negociaciones de los miembros individua-
les deben atribuírsele a la sociedad, la venta aquí envuelta no
fué en sustancia hecha por la sociedad bajo la norma estable-
cida en el caso de *Court Holding Co.* según se aclaró por el
de *Cumberland Public Service Co.* Bajo dichos casos la venta
se atribuye a la corporación a los fines de la contribución
sobre ingresos si existe ". . . una liquidación de la corporación
*luego de hacerse o convenirse la venta de su activo*, en un es-
fuerzo para transferir la ganancia producto de la venta de la
corporación a los accionistas individuales." *Gilman* v. *Com-
missioner*, 14 T.C. 833, 841 (1950) (bastardillas nuestras) :
*Doyle Hosiery Corporation* v. *Commissioner*, 17 T.C. 641
(1951) ; *Oahu Beach & Country Homes, Ltd.* v. *Commis-
sioner*, 17 T.C. 1472 (1952) ; *St. Louis Union Trust Co.* v.
*Finnegan*, 197 F.2d 565 (C.A. 8, 1952) ; *Herbert* v. *Riddell*,
103 F.Supp. 369 (Dist.Ct., Cal., 1952) ; *Burley Tobacco*

*Warehouse* v. *Glenn,* 106 F.Supp. 949 (Dist.Ct., Ky., 1952). Los documentos presentados en este caso no demuestran tal convenio o venta. Como ya se ha indicado, las cartas del Lic. Tormes—aun cuando fueran atribuíbles a la sociedad—demuestran a lo sumo negociaciones preliminares. Nada hay en ellas—o en la conducta de las partes—que demuestre que se había efectuado una transacción en cuanto al precio de venta, a la forma del pago, y a las otras condiciones de venta con anterioridad a la disolución de la sociedad. Por el contrario, los autos demuestran afirmativamente que se llegó a un acuerdo sobre tales aspectos mediante las negociaciones que realizaron los ex miembros individuales de la sociedad con representantes de la Aguirre después de haberse disuelto aquélla.[3] De conformidad, no podemos intervenir con la conclusión de hecho de que la venta en este caso ocurrió después de disuelta la sociedad. Y el principio enunciado en el caso *Cumberland Public Service Co.* a la pág. 455 es predominante: *"No importa cuál pudiera ser el motivo* y no importa cuán pertinente pudiera ser al determinar si la transacción fué en efecto real o ficticia, las *ventas* de bienes físicos por los accionistas *seguidas de una distribución genuina en liquidación* no pueden atribuírseles a la corporación con fines contributivos."* (Bastardillas nuestras.) [4]

La sentencia del anterior Tribunal de Contribuciones será confirmada.

El Juez Asociado Sr. Belaval concurre en el resultado.

---

[3] El precio de venta de $625,000 y la forma del pago que incluía un considerable número de pagarés con intereses al 4%, se hallan en la escritura de venta. Otra disposición importante de la transacción, aunque no aparecía en dicha escritura, era al efecto de que ninguno de los ex miembros de la sociedad se dedicaría al negocio de molienda de cañas de azúcar durante un período de quince años, asegurándole con ello a la Aguirre que obtendría lo que en realidad se proponía en esta transacción—el derecho de moler en sus otras centrales las cañas cosechadas tanto por los ex miembros · como por los colonos de la Central Caribe. La prueba demuestra que finalmente estos términos se negociaron y acordaron después de ocurrida la disolución durante dos días antes del otorgamiento de la escritura de venta el 15 de octubre de 1946.

[4] *Cf.* sec. 337 (*a*) del Código Federal de Rentas Internas de 1954. Bajo esta sección, según Rabkin y Johnson, *supra,* págs. 41–43: "Bajo la

ley anterior, la venta del activo hecha por una corporación seguida de una liquidación de la corporación produjo dos eventos tributables, trayendo como resultado doble tributación cuando tanto la corporación como los accionistas tuvieron beneficios. Para evitar la doble tributación, estas transacciones tomaron la forma de una liquidación corporativa seguida de una venta del activo por los accionistas. Aun en estos últimos casos muchas veces era difícil tomar precauciones contra la doble tributación, suponiendo que no se presentaran dificultades prácticas a la liquidación antes de la venta. El nuevo Código contiene una regla definitiva que iguala las ventas postliquidación con las preliquidación. Como regla general, si una corporación adopta un plan de liquidación después del 22 de junio de 1954, y dentro de los 12 meses después de adoptar dicho plan todo su activo (excepto los bienes reservados para pagar reclamaciones) es distribuído en liquidación total, entonces no se le reconoce a tal corporación ganancia o pérdida alguna proveniente de la venta o permuta por ella efectuada de sus 'bienes' dentro de tal período de 12 meses. . . ."