## THE TALUS.

(Circuit Court of Appeals, Fifth Circuit. January 25, 1918.)

No. 3119.

1. SEAMEN �köm23—WAGES—PART PAYMENT AT INTERMEDIATE PORTS.

Under Seamen's Act March 4, 1915, c. 153, § 4, 38 Stat. 1165 (Comp. St. 1916, § 8322), which requires payment to every seaman of one-half part of the wages which he shall have then earned at every port where the vessel, after the voyage has been commenced, shall load or deliver cargo before the voyage is ended, a seaman at any such intermediate port is entitled to demand one-half his wages earned during the voyage to that time, less lawful payments previously received; but advance payments made by a foreign ship to foreign seamen in a foreign port, where the law of the country permits it, are lawful payments within this provision, and to be deducted, section 11 of the act (Comp. St. 1916, § 8323), prohibiting such advances under penalty, being applicable only to American seamen and to foreign seamen while in American ports.

2. CONTRACTS ⊛101(1)—VALIDITY—LAW GOVERNING.

The usual rule is that, where a contract involves no moral turpitude, but is malum prohibitum only, if it is valid where made, it will be held valid in the courts of the United States elsewhere than where it was made, although it would be invalid if made there.

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. SEAMEN ⬲24—PART PAYMENT OF WAGES "EARNED."

 The word "earned," as used in Seamen's Act March 4, 1915, c. 153, § 4, which requires payment to every seaman of one-half part of the wages which he shall have then earned, at intermediate ports, is used in the sense of owing, and to describe wages for which the seaman has done the work whether then due or not.

 [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Earn.]

Appeal from the District Court of the United States for the Southern District of Alabama; Robert T. Ervin, Judge.

Suit in admiralty by Erik Sandberg and others against the British ship Talus; John McDonald, claimant. Decree for libelants, and claimant appeals. Reversed.

For opinion below, see 242 Fed. 954.

Joseph N. McAleer, James H. Kirkpatrick, and Palmer Pillans, all of Mobile, Ala. (M. V. Hanaw, of Mobile, Ala., of counsel), for appellant.

Alex T. Howard, of Mobile, Ala., for appellees.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. This is an appeal from a final decree in admiralty against the appellant, as claimant of the ship Talus, and in favor of certain seamen for the amount of wages alleged to be due them. The libel was originally filed on behalf of six seamen, the court below dismissed the libel as to two, and from its decree in this respect no appeal was taken by them. In favor of the remaining four a decree was rendered for the respective amounts found due them, and from this part of the decree, the appeal was taken by the claimant.

The facts were stipulated in the record, and the appeal presents for decision the proper construction of section 11, in connection with section 4, of the act of Congress approved March 4, 1915 (38 Statutes at Large, 1164, 1185), entitled "An act to promote the welfare of American seamen in the merchant marine of the United States, to abolish arrest and imprisonment as a penalty for desertion and to secure the abrogation of treaty provisions in relation thereto, and to promote safety at sea." The sections involved are those which prohibit the making of certain advances to seamen before the commencement of the voyage for which they ship, and which require that half their earned wages be paid, upon arrival of the ship in any port where it receives or delivers cargo, with certain limitations.

The Talus was a British ship, which sailed from the port of Liverpool to Mobile upon the voyage in question. The libelants were British subjects, and the advances, which are questioned, were made to them in Liverpool at the time they were shipped and were valid under the laws of Great Britain. The District Judge disallowed the advances in reckoning the amount due libelants, and it is conceded that, had the advances been taken into account, or if only wages earned by appellants while the ship was in the port of Mobile had

been considered, there would have been nothing due libelants at the time of their demand, and that the libel should stand dismissed, and, on the other hand, that if wages earned from the time of sailing from Liverpool are to be considered, and if the advances there made were properly ignored by the District Court, the decree as there rendered should be here affirmed.

[1] Section 4 of the act of March 4, 1915, commonly known as the "La Follette Act," is found on page 1165 of volume 38 of the Statutes at Large, and is as follows:

"Sec. 4. That section forty-five hundred and thirty of the Revised Statutes of the United States be, and is hereby, amended to read as follows:

"'Sec. 4530. Every seaman on a vessel of the United States shall be entitled to receive on demand from the master of the vessel to which he belongs one-half part of the wages, which he shall have then earned at every port where such vessel, after the voyage has been commenced, shall load or deliver cargo before the voyage is ended and all stipulations in the contract to the contrary shall be void: Provided, such a demand shall not be made before the expiration of, nor oftener than once in five days. Any failure on the part of the master to comply with this demand shall release the seaman from his contract and he shall be entitled to full payment of wages earned. And when the voyage is ended every such seaman shall be entitled to the remainder of the wages which shall then be due him, as provided in section forty-five hundred and twenty-nine of the Revised Statutes: Provided further, that notwithstanding any release signed by any seaman under section forty-five hundred and fifty-two of the Revised Statutes any court having jurisdiction may upon good cause shown set aside such release and take such action as justice shall require: And provided further, that this section shall apply to seamen on foreign vessels while in harbors of the United States, and the courts of the United States shall be open to such seamen for its enforcement.'"

Section 11 of the same is found on page 1168 of the same volume, and the material subdivisions of the section are the following:

"(a) That it shall be, and is hereby, made unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same, or to pay such advance wages, or to make any order, or note, or other evidence of indebtedness therefor to any other person, or to pay any person, for the shipment of seamen when payment is deducted or to be deducted from a seaman's wages. Any person violating any of the foregoing provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than $25 nor more than $100, and may also be imprisoned for a period of not exceeding six months, at the discretion of the court. The payment of such advance wages or allotment shall in no case except as herein provided absolve the vessel or the master or the owner thereof from the full payment of wages after the same shall have been actually earned, and shall be no defense to a libel suit or action for the recovery of such wages. If any person shall demand or receive, either directly or indirectly, from any seaman or other person seeking employment, as seaman, or from any person on his behalf, any remuneration whatever for providing him with employment, he shall for every such offense be deemed guilty of a misdemeanor and shall be imprisoned not more than six months or fined not more than $500. * * *

"(e) That this section shall apply as well to foreign vessels while in waters of the United States, as to vessels of the United States, and any master, owner, consignee, or agent of any foreign vessel who has violated its provisions shall be liable to the same penalty that the master, owner, or agent of a vessel of the United States would be for similar violation.

"The master, owner, consignee, or agent of any vessel of the United States, or of any foreign vessel seeking clearance from a port of the United States, shall present his shipping articles at the office of clearance, and no clearance

shall be granted any such vessel unless the provisions of this section have been complied with."

The appellants first contend that the decree was erroneous because they contend that section 4 of the act, in providing that the seaman is entitled "to receive on demand from the master of the vessel to which he belongs one-half part of the wages which he shall have then earned at every port where such vessel, after the voyage has been commenced, shall load or deliver cargo, before the voyage is ended," only requires the master to pay one-half of the wages earned by the seaman from the time of the arrival of the ship in such a port until the demand. We think the plain purpose of Congress was to allow the seamen the benefit of half his earned wages, less payments, upon each occasion upon which the statute permits him to demand them from the commencement of the voyage to the time of demand, and that the words of the statute "then earned" are not limited by the succeeding words "at every port," but that the function of the latter is to describe the place of legal demand only. Absence of punctuation between the words "then earned" and the words "at every port" is of little persuasiveness as against the evident intent of Congress. The probable brief duration of a ship's stay in intermediate ports and the small amount of probable wages there earned by the seamen, would make the required payments of little value to them.

The appellant's further contention is that the District Court erroneously refused to consider as a proper deduction from the earned wages of libelants certain advances made them by the master in Liverpool, when they were engaged. The statute says that a seaman is to be paid on demand "one-half part of the wages which he shall then have earned." That previous lawful payments should be first deducted, is conceded. Otherwise the law might require the master to pay to the seaman before the voyage was complete more than the amount stipulated to be paid for the whole voyage.

[3] The word "earned" is used in the sense of owing. Congress avoided the use of the word "due," as there might, by the terms of the contract between the ship and the seaman, be no wages due till the end of the voyage. The use of the word "earned" was to describe wages, for which the seaman had done the work, whether then due or not, and not to fix the amount of what was owing and half of which was to be paid, regardless of previous lawful payments. The question remains whether advances made the libelants by the master in Liverpool are legal payments. Had they been made in an American port, though by a foreign ship and to foreign seamen, the language of section 11 of the act would have invalidated such advances as payments. Patterson v. The Eudora, 190 U. S. 169, 23 Sup. Ct. 821, 47 L. Ed. 1002. The question is whether the language of the section prohibits the making of advances in foreign ports by foreign ships to foreign sailors. The case cited is limited in its effect and language to advances made within the territorial jurisdiction of the United States.

It is competent for Congress to prescribe conditions of entry to and clearance from its own ports by foreign vessels, since it may ex-

clude them altogether. The section under construction, however, does more than that. Subdivision (e) provides that this section—

"shall apply, as well to foreign vessels while in waters of the United States, as to vessels of the United States, and any master, owner, consignee, or agent of any foreign vessel who has violated its provisions shall be liable to the same penalty that the master, owner, or agent of a vessel of the United States would be for similar violation."

If this section of the act applies to advances made by a master, owner, or agent of a foreign ship in a foreign port, its effect would be to render such master, owner, or agent guilty of a misdemeanor and subject him to prosecution and punishment, if found in this country, for an act done without the jurisdiction of this country, and which was a lawful act where done. The competency of Congress to so enact is of such grave doubt that a court would not construe the language of an act to that effect, unless forced so to do. The language of section 11 does not require such an unreasonable construction. Indeed, the words of subdivision (e) of the section, "shall apply as well to foreign vessels, while in waters of the United States, as to vessels of the United States," would seem to imply the contrary. We think the reasonable construction of the section is that it covers only such advances as it was within the competency of Congress to criminally punish the making of, viz. advances made within the territorial waters and jurisdiction of this country by whomever made and to whomever paid. This gives the section a legitimate field of operation. It was the purpose of Congress to protect American seamen, as far as it had jurisdiction to act. In doing so, in order to avoid discrimination against American ships, it was necessary to include foreign ships and sailors under like circumstances. There was, however, no policy to be subserved in the interest of foreign sailors, so far as the title to the act shows, and the debate upon it in Congress.

In protecting American sailors on American ships in foreign ports, the same question of discrimination against American ships would be encountered. Congress might have treated it, by imposing as a condition upon the entry to and clearance from American ports of both foreign and domestic vessels, that all advances, which were made to seamen in a foreign port before the voyage began, should be agreed by the ship to be disregarded in settlements required by the law to be made with seamen in the ports of this country. Instead of doing so, it went further and provided that every advance, prohibited by the act, including those made by the agents, owners, or masters of foreign ships, should be punishable as a misdemeanor. Its determination to make the criminal penalty cover all advances prohibited by the section indicates that its intention was to limit the scope of the prohibited advances to its undoubted competency in that respect; i. e., to such as were made within its undoubted jurisdiction to punish crimes. It also prevents a construction that would separate the penalty provision from any class of the prohibited advances, and so sustain the law in other respects as to the class of advances to which the penalties are legally inapplicable, since the penalty provision is as wide as the prohibition itself and covers every advance, whether made by a domestic or foreign ship which is prohibited by the terms of the act.

Probably Congress felt that the sanction of criminal penalties would be more effective than the prescribing of mere civil conditions, and for that reason confined its legislation to advances made under conditions which gave it jurisdiction to punish the making of them criminally. The provisions of the section, when so construed, are broad enough to fully protect American sailors in American ports, and possibly in foreign ports, and it was not essential to the end in view to include advances to foreign sailors on foreign ships in foreign ports. The debates in the Senate show no wider purpose to have been in the purview of the legislators. The abrogation of existing treaties was necessary, though the scope of the act was confined to advances made in American ports, both for the purpose of transferring wage disputes on foreign vessels to the courts of the United States from the consular courts of the treaty nations, as provided for in section 4 of the act, and to enable the provisions of the law with regard to arrests for desertion to be executed, without conflicting with existing treaties. Provisions in the act to that end do not support appellees' contention.

It is further contended that, though the statute is not itself applicable to advances made in foreign ports to foreign seamen by foreign ships, it outlines a policy against the making of such advances anywhere, and that, pursuing that policy, the courts of the United States will not recognize such advances. The case of Arden Lumber Co. v. Henderson Iron Works, 83 Ark. 240, 103 S. W. 185, is cited by appellees in support of this contention. The policy of the United States respecting advances to seamen is only exhibited by the section of the act in question and the corresponding sections of its predecessors, and, in all these acts, as we construe them, this policy was confined to advances made to American seamen and to foreign seamen, only while in American ports. No policy against the making of advances to foreign seamen in foreign ports by foreign ships, where the law of the country permits it, can be deduced from them; nor do the debates in Congress upon the La Follette bill show a wider purpose than the protection of American seamen against advances, the inclusion of foreign ships and seamen being incidental only and to avoid discrimination against American ships.

[2] The usual rule is that, where a contract involves no moral turpitude, but is malum prohibitum only, if it is valid where made, it will be held valid in the courts of the United States elsewhere than where it was made, when rights are predicated upon it, though it would be invalid if made there. Ward v. Vosburgh (C. C.) 31 Fed. 12; Lehman v. Feld (C. C.) 37 Fed. 852; Wilhite v. Houston, 200 Fed. 390, 118 C. C. A. 542; Berry v. Chase, 148 Fed. 625, 77 C. C. A. 161.

Our conclusion is that the District Court erred in its construction of the Act and in disallowing the advances. The decisions of the District Courts are in conflict. The case of The State of Maine (D. C.) 22 Fed. 734, supports the views we have expressed. The cases of The Rhine (D. C.) 244 Fed. 833, and of The Delagoa (D. C.) 244 Fed. 835, and possibly the case of The Ixion (D. C.) 237 Fed. 142, adopt the view taken by the District Judge in this case.

It follows that the decree of the District Court must be reversed and

the cause remanded, with directions to that court to enter a decree dismissing the libel as to all the libelants and taxing appellees with the costs of the appeal; and it is so ordered.