247 F.2d 864
 The COLD METAL PROCESS COMPANY, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
The LEON A. BEEGHLY FUND, The Union National Bank of Youngstown, Ohio, Trustee, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 13047.
 No. 13048.
 United States Court of Appeals Sixth Circuit.
 September 10, 1957.
 
 Howard F. Burns, Cleveland, Ohio (William H. Fleming and Alan G. Rorick, Cleveland, Ohio, on the brief), for petitioners.
 Melva M. Graney, Dept. of Justice. Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., and Harry Baum, Atty., Dept. of Justice, Washington, D. C., on the brief), for respondent.
 Before SIMONS, Chief Judge, and ALLEN and MILLER, Circuit Judges.
 SHACKELFORD MILLER, JR., Circuit Judge.
 
 
 1
 The petitioners, The Cold Metal Process Company, hereinafter referred to as Cold Metal, and The Leon A. Beeghly Fund, The Union National Bank of Youngstown, Ohio, Trustee, hereinafter referred to as Trustee, seek review of the judgment of the Tax Court which adjudged an income tax deficiency for the year 1949 against Cold Metal in the amount of $3,931,174.37 and in the same amount against the Trustee as a transferee of Cold Metal. The stipulated facts are stated by the Tax Court in its Findings of Fact and Opinion reported at 25 T.C. 1333, to which reference is made for the facts in detail. We will restate here what we believe to be sufficient for an understanding of the issue.
 
 
 2
 The question involved is the 1949 income tax liability of a corporation, which was dissolved in 1945, on income received in 1949 by its sole stockholder arising from assets received by the stockholder in dissolution in 1945. The income under consideration resulted from transactions by the corporation prior to dissolution but was not accruable to the corporation prior to dissolution because of litigation instituted by the Government which strenuously contested the legal right of the corporation to such income until the termination of the litigation in 1949.
 
 
 3
 Cold Metal, an Ohio corporation, was incorporated in 1926 with 2000 shares of outstanding common stock. It kept its books on an accrual basis of accounting. Its principal assets consisted of United States patents No. 1,744,016 and No. 1,779,195, hereinafter referred to as the patents, relating to the hot and cold rolling of metals. The process covered by the patents gained wide usage in the metals industry, and beginning in 1928 Cold Metal granted nonexclusive licenses to certain manufacturers. Various other manufacturers, not licensed, installed rolling mills which Cold Metal claimed embodied its inventions and infringed its patents. Cold Metal brought suits for infringement against several large producing companies.
 
 
 4
 In Cold Metal Process Company v. Carnegie-Illinois Steel Corporation, 3 Cir., 108 F.2d 322, certiorari denied and petition for rehearing denied 309 U.S. 665, 667, 60 S.Ct. 590, 84 L.Ed. 1012, the Court of Appeals held the patents valid and infringed. The suit was settled for $3,850,000 and the granting by Cold Metal of non-exclusive licenses on a royalty basis. See also: Cold Metal Process Co. v. Republic Steel Corp., 6 Cir., 233 F.2d 828, certiorari denied 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86, a recent opinion of this Court, for a thorough discussion of the validity of the patents.
 
 
 5
 In 1943 the United States started a suit, hereinafter referred to as the Cancellation suit, in the United States District Court for the Northern District of Ohio against Cold Metal seeking cancellation of the patents on the ground of fraud or a mutual mistake of fact in the granting of them. On the motion of the United States, the District Court entered an interlocutory order on October 10, 1944, hereinafter referred to as the impounding order, which enjoined Cold Metal until final judgment in the suit from receiving any further moneys by way of royalties or damages for infringement under the patents and from transferring the patents in any manner whatsoever. The order directed that royalty payments and damages for infringement be deposited with the Clerk of the Court. Final judgment in the District Court dismissing the complaint was entered for Cold Metal on September 20, 1945. The impounding order was restored pending the Government's appeal to the Court of Appeals. Before this case was finally terminated there was paid into court and impounded under the provisions of the order the sum of $9,749,000, which was eventually released and paid in 1949 to the Trustee, who, as sole stockholder of Cold Metal, had acquired all its assets in dissolution. This money and other payments received by the Trustee in 1949, following the proceedings and litigation hereinafter referred to, constitute the basis for the deficiency assessment against Cold Metal for the year 1949, herein in controversy.
 
 
 6
 In 1940 Leon A. Beeghly, who was one of Cold Metal stockholders and Chairman of its Board of Directors, transferred 150 shares of Cold Metal stock to The Union National Bank of Youngstown, Ohio, in trust for certain charitable purposes, herein referred to as the Trustee. In 1944 he transferred one additional share to the Trust.
 
 
 7
 In 1942 and 1943 Cold Metal brought several suits for alleged infringement of the patents against a number of steel companies. Thereafter, negotiations were entered into, looking to the settlement of these suits. A plan was suggested by several of their attorneys that the way to settle the controversy was for the stockholders of Cold Metal to sell their stock to the steel companies or to an unnamed banker. This plan appealed to the stockholders because of the impounding order which resulted in the discontinuance of dividends and also because Cold Metal became pressed for money to continue prosecution of its claims. However, neither the steel companies nor the unnamed banker would have been willing to purchase the stock until the termination of the Cancellation suit. The steel companies wished to settle within the taxable year of 1945 as the excess profit tax was due to expire at the end of 1945. They were not concerned with whom they settled as long as the settlement was binding. An alternate plan was worked out by which the stockholders of Cold Metal would sell all of their shares to the Trustee, Cold Metal would be liquidated with the Trustee as sole stockholder acquiring all its assets, and the infringement claims would then be settled with the steel companies. Under this plan the Trustee assumed a risk that the assets acquired through the dissolution of Cold Metal would not produce sufficient funds to meet its obligations to pay the debts and taxes of Cold Metal, the purchase price of the stock, and the future expenses to be incurred in connection with pending litigation. On the other hand, the stockholders who sold at the price offered by the Trustee, thus limiting the amount they would receive, would receive a partial cash payment immediately and very substantial payment later if and when litigation was successfully terminated.
 
 
 8
 While the negotiations were being conducted with the steel companies, negotiations were also taking place among the stockholders of Cold Metal with respect to the sale of their shares to the Trustee. On December 28, 1945, the Trustee entered into a separate agreement with each of the other stockholders whereby it purchased all of their shares in Cold Metal for a total of $11,131,000 at prices varying from $4250 to $7500 per share. $200 per share was to be paid in cash upon delivery of the certificates. The balance was to be paid at a later time in accordance with the plan looking to the dissolution of Cold Metal and to the payment to the Trustee, who would acquire its assets, by the Clerk of the Court of the impounded funds in the Registry of the Court and the payment to the Trustee by sundry licensees of royalties under patents formerly owned by Cold Metal. On December 29, 1945, certificates for the 1849 shares were delivered duly endorsed to the Trustee. In accordance with a pre-arranged plan between certain former stockholders of Cold Metal, The Union National Bank of Youngstown, Ohio, and the Trustee, the Trustee acquired $375,000 in cash which it used to make the cash payments totaling $369,800 to the transferring stockholders of Cold Metal. Following delivery by the Trustee to Cold Metal of the certificates covering the 1849 shares, three certificates were delivered to the Trustee making it the record owner of all the 2000 shares of outstanding stock.
 
 
 9
 While the above transactions were taking place a meeting of the stockholders of Cold Metal was called and a resolution to dissolve the corporation was adopted. A further resolution was adopted directing the distribution of all of its assets to the Trustee, subject to the impounding order in the Cancellation suit.
 
 
 10
 On December 29, 1945, following the stockholders meeting, a certificate of dissolution of Cold Metal was filed with the Secretary of State of Ohio, and the officers of Cold Metal executed an instrument entitled "Assignment and Distribution in Kind" transferring to the Trustee all of the assets of Cold Metal, subject, however, to the impounding order in the Cancellation suit. This was accepted in writing by the Trustee.
 
 
 11
 By contracts executed December 29, 1945, six of the steel companies settled with Cold Metal and the Trustee claims against them for past infringement for a total of $9,000,000 and took license agreements under the patents. On December 31, 1945, a settlement was reached with Inland Steel Company in the amount of $600,000. On March 19, 1946, a settlement was reached with Signode Steel Strapping Company in the amount of $39,000. On September 30, 1946, a settlement was reached with Crucible Steel Company in the amount of $110,000. The amounts called for by these settlements were paid to the Clerk of the District Court in the Cancellation suit. This brought the total amount impounded in that suit to $9,749,000.
 
 
 12
 On December 29, 1945, a settlement agreement was reached with Allegheny-Ludlum Steel Corporation and its subsidiary, Wallingford Steel Company, in the amounts of $700,000 and $300,000, respectively. These amounts, totaling $1,000,000, were paid into the District Court on July 9, 1947, in a different suit, namely, United States v. Thomas Steel Corporation, 109 F.Supp. 418, hereinafter referred to.
 
 
 13
 On May 31, 1946, an order was entered by the District Court in the Cancellation suit modifying the impounding order so as to allow Cold Metal to transfer to the Trustee the patents, together with all rights and causes in action thereunder, conditioned upon the Trustee entering a general appearance in the Cancellation suit and subjecting itself to the impounding order, which the Trustee did. On June 6, 1946, an assignment of the patents was recorded in the United States Patent Office.
 
 
 14
 The Court of Appeals for the Sixth Circuit affirmed the judgment of the District Court in the Cancellation suit on December 12, 1947, reported at United States v. Cold Metal Process Co., 164 F.2d 754, certiorari denied on May 3, 1948, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742, and petition for rehearing denied on June 1, 1948, 334 U.S. 835, 68 S.Ct. 1343, 92 L.Ed. 1761. On June 16, 1948, the District Court over the Government's objections entered an order sustaining a motion of Cold Metal and the Trustee, allowing the withdrawal of the impounded funds but not earlier than June 25, 1948.
 
 
 15
 In the meantime, starting in 1943, the United States proceeded under the provisions of the Royalty Adjustment Act, Sections 89-96, Title 35 U.S.Code, and was successful in having the royalties under the licenses from Cold Metal established at a value of zero. Based on this ruling, the United States on March 3, 1947, filed suit in the District Court for the Northern District of Ohio, Eastern Division, against Thomas Steel Corporation, Cold Metal, the Trustee and twenty-five licensees to prohibit the payment of royalties to Cold Metal. It was in this suit, hereinbefore referred to, that the $1,000,000 was paid into Court on June 9, 1947. In addition to this $1,000,000 which was paid into Court for past infringement, $6,964,695.92 was paid into Court as royalties under licenses granted by Cold Metal. On August 29, 1949, the District Court entered a pre-trial consent order providing that a part of the royalties was outside the operation of the Royalty Adjustment Act and, accordingly, the Clerk of the Court paid to the Trustee the sum of $3,424,278.58.
 
 
 16
 Proceeding on the same theory, the United States on June 23, 1948, two days before the impounded funds in the Cancellation suit were subject to release, filed suit in the District Court against Youngstown Sheet & Tube Company, Cold Metal, the Trustee, and the steel companies which had made settlement agreements with respect to past infringement claims. The Government alleged that the funds impounded in the Cancellation suit were subject to the ruling under the Royalty Adjustment Act and the Court was asked to retain these funds pending the determination of the rights of the parties. The validity of the ruling under the Royalty Adjustment Act was attacked both in this suit and in the suit against the Thomas Steel Corporation. The District Court, after entering a temporary restraining order preventing the distribution of the impounded funds, ruled that the Royalty Adjustment Act applied only to royalties and not to moneys paid in settlement of infringement claims and denied the Government's motion for a preliminary injunction impounding these funds for a further period. United States v. Youngstown Sheet & Tube Co., D.C., 81 F.Supp. 996. Application to the Court of Appeals to stay the order of denial was denied on July 21, 1948, on condition that the impounded funds, when withdrawn from the District Court, be deposited with the Federal Reserve Bank at Cleveland for safekeeping and investment until final disposition of the appeal to the Court of Appeals. Pursuant to the order, the impounded funds in the amount of $9,749,000 were paid over to the Trustee on or about July 26, 1948, and were immediately deposited by it as directed.
 
 
 17
 On December 6, 1948, the Court of Appeals affirmed the ruling of the District Court. United States v. Youngstown Sheet & Tube Co., 6 Cir., 171 F.2d 103. It appearing that the United States did not contemplate litigating the matter further, the Court of Appeals on January 7, 1949, entered an order permitting the Trustee to withdraw the funds deposited with the Federal Reserve Bank. On January 12, 1949, the District Court entered an order permitting the withdrawal of $1,000,000 deposited with the Clerk of the Court in the suit against the Thomas Steel Corporation. Some of the steel companies which had entered into license agreements paid into Court in this case royalties for the period of January 1, 1946, to January 14, 1947. Of the total of these payments, $759,499.90 was held not subject to the Royalty Adjustment Act and was also released to the Trustee in 1949.
 
 
 18
 In 1940 Cold Metal had brought suit against McLouth Steel Corporation to recover royalties allegedly due under a 1934 license agreement with Cold Metal. This litigation ultimately resulted in a judgment against McLouth and the subsequent payments to the Trustee in 1949 of amounts totaling $423,731.61. Cold Metal Process Co. v. McLouth Steel Corp., 6 Cir., 170 F.2d 369. This included royalties and interest thereon for the periods both before and after the date of dissolution of Cold Metal.
 
 
 19
 The Trustee also received during 1949 other payments under license agreements and from miscellaneous sources. The total amount received by it during 1949 from the various sources hereinabove referred to was $15,438,220.71. All of the funds in question were paid directly to the Trustee. Nothing was paid to Cold Metal. It was stipulated by the parties that except insofar as it might be otherwise determined by the final decision of this case, Cold Metal acquired no assets after December 28, 1945, and had no income or disbursements.
 
 
 20
 Cold Metal was a party to a number of actions which were pending after December 29, 1945, in addition to those which were settled without trial on December 29, 1945. At the end of 1949 it was the sole plaintiff in actions against Detroit Steel Corporation and Ford Motor Company. Six other actions originally brought by it in the United States District Courts were pending and untried at the end of 1949 in which, however, the Trustee had been added as a party-plaintiff during 1948 and 1949. In 1946 the Trustee was added as the plaintiff in an action by Cold Metal against McLouth Steel Corporation above referred to. Both Cold Metal and the Trustee were plaintiffs in an action filed in 1946 against the Bopp Steel Corporation. Cold Metal was made a party-plaintiff to two actions against the United States filed by it and the Trustee in 1949 in the United States Court of Claims for the stated reason that the Government threatened to defend on the ground that claims against the United States could not be assigned. At the end of 1949, Cold Metal was the sole defendant in an action brought by the E. W. Bliss Company.
 
 
 21
 The Commissioner of Internal Revenue determined deficiencies in Cold Metal's tax liability for the year ending December 31, 1945, in the amount of $7,212,796.65 on the basis that the settlement of the patent infringement claims in 1945 resulted in accrued income for that year. Cold Metal contested the liability in a proceeding in the Tax Court on the ground that the amounts involved in the settlements were not in fact received in 1945, that they were not properly accruable in that year, and that even if they were then accruable they must be ascribed to the Trustee rather than to Cold Metal. The Tax Court reviewed the litigation hereinabove referred to and pointed out that at the close of 1945 the Government appeared to be firmly convinced, and was strenuously acting on its conviction, that the two patents had been improperly obtained, were invalid and ought to be cancelled, and that Cold Metal, or anyone who might stand in its place, was not entitled to enjoy and retain any benefits under these patents; that the Government persistently blocked every effort to have the impounding order modified so as to permit the release of the funds; that the right of Cold Metal to obtain the impounded funds was successfully contested for some three years after the close of the taxable year involved; and that there was no certainty that its right thereto would ever be established. It ruled that under the circumstances it could not be required to accrue the amounts involved as income in 1945 and that to the extent the deficiencies asserted were based upon the ruling that said amounts were included in Cold Metal's 1945 income, they were disapproved. Cold Metal Process Co. v. Commissioner, 17 T.C. 916. The judgment was affirmed by this Court without opinion in accordance with the decision of the Tax Court.
 
 
 22
 On January 11, 1951, the Commissioner issued the statutory notice of deficiencies in the present proceeding determining that the $15,438,220.71 received by the Trustee in 1949 was taxable as ordinary income to Cold Metal for the year 1949. A deficiency of $5,550,140.33 was assessed against Cold Metal and also against the Trustee as transferee. In the proceeding before the Tax Court contesting these assessments, the Tax Court reduced the amount of the deficiency to $3,931,174.37. Cold Metal Process Co. v. Commissioner, 25 T.C. 1333.
 
 
 23
 The Tax Court held that where the corporate entity, after statutory dissolution, was still used so extensively as in the present case in aiding its stockholder to realize on claims which it had assigned to it, the corporation was in existence for tax purposes during 1949, citing United States v. Joliet & Chicago R. Co., 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658, and Henry Hess Co. v. Commissioner, 16 T.C. 1363. It also held that with respect to income earned after December 29, 1945, no part of that income was attributable to Cold Metal since it assigned and transferred at that time the patents themselves as well as the income which was subsequently earned by them. However, it ruled that that portion of the $15,438,220.17 representing royalties and amounts paid for infringement of patents on production prior to December 29, 1945, totaling more than $12,000,000, was taxable to Cold Metal, since it represented "income earned, although not accruable" prior to the date of the assignment, citing Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81; Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75; Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, and other cases.
 
 
 24
 The present case does not involve the 1949 income tax liability of the Trustee other than as a transferee. Sec. 311, Internal Revenue Code of 1939, 26 U.S.C. § 311. No question is involved about the receipt of the money by the Trustee in 1949 or the fact that it represented accrued income to the Trustee in that year. Whether or not the Trustee, outside of its status as a transferee, has a 1949 income tax liability or is exempt as a charitable organization, is not before us. If there is no 1949 income tax liability against Cold Metal, there is no transferee liability against the Trustee. Accordingly, the validity of the 1949 assessment against Cold Metal is the question presented.
 
 
 25
 In making its ruling, the Tax Court rejected the Commissioner's contentions (1) that Cold Metal, by transferring its assets to the Trustee, merely turned its assets over to a receiver or trustee, in liquidation which continued to operate the corporation, and therefore the corporation was still in existence and received the income in 1949, and (2) that the alleged sale of stock to the Trustee was a sale in form only which for tax purposes should be disregarded. We agree with the rulings for the reasons given by the Tax Court. The Commissioner does not press those contentions on this review.
 
 
 26
 The Government in its brief calls attention to the fact that the purchase of the stock of Cold Metal by the Trustee, the dissolution of Cold Metal, and the distribution of its assets to the Trustee was pursuant to a "prearranged plan." Petitioners concede this to be so. If the transaction was a bona-fide one and was one in substance rather than merely in form, the existence of a motive to avoid taxation by the use of such a plan is not material. United States v. Cumberland Public Service Co., 338 U.S. 451, 455, 70 S.Ct. 280, 94 L.Ed. 251; United States v. Cummins Distilleries Corp., 6 Cir., 166 F.2d 17. The Tax Court did not base its ruling upon any finding that the transaction was one in form only, and in our opinion there is no substantial basis for such a contention.
 
 
 27
 This case is not the type of case under consideration in Helvering v. Horst, supra, Helvering v. Eubank, supra, Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055, and other similar cases. Those cases involved a gift of income payable in the future, as distinguished from a gift of income producing property where the donor relinquishes to the donee not merely the income which is payable in the future, but also complete ownership and control of the property which produces the income. Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465; Helvering v. Horst, supra, 311 U.S. at pages 118-119, 61 S.Ct. 144. When the ownership of the income producing property remains in the donor a gift of only the income therefrom is taxable to the donor rather than the donee. As stated in Lucas v. Earl, supra, 281 U.S. 111, 50 S.Ct. 241, the fruits cannot be attributed to a different tree from that on which they grew. In the present case there was no retention by Cold Metal of any right, title or interest of any kind in the patents transferred to the Trustee. Both the income producing property and the income therefrom were transferred in their entirety and unconditionally to the Trustee. Helvering v. Horst, supra, and other similar cases are accordingly not applicable. Blair v. Commissioner, supra, 300 U.S. 5, 13, 57 S.Ct. 330; Telephone Directory Advertising Co. v. United States, 142 F.Supp. 884, 889, 142 Ct.Cl. 670; Commissioner of Internal Revenue v. Reece, 1 Cir., 233 F.2d 30, 34-35.
 
 
 28
 In United States v. Joliet & Chicago Railroad Co., supra, the taxpayer retained title to the chose in action which it received in exchange for its property, and the annual payments to the taxpayer's stockholders thereafter were in perfomance of the obligation under the chose in action. The stockholders received the payments because of their status as stockholders, not as transferees of the chose in action. Payments called for and made under the chose in action were taxable to the taxpayer, who was still owner of the chose, even though the payments were actually made to the stockholders at the direction of the taxpayer.
 
 
 29
 The Tax Court recognized the well-settled distinction shown by such cases as Helvering v. Horst, supra, and Blair v. Commissioner, supra. While recognizing that the income involved in this case did not accrue as taxable income until after the transfer of the income producing property, as had been held by it in 17 T.C. 916, it nevertheless based its ruling upon its conclusion that the income had been "earned," although not accruable, prior to the assignment, citing Estate of Bertha May Holmes, 1 T.C. 508. But the income involved in that case was far different from the income in this case. The income there treated as earned at the time of the transfer was in the nature of a corporate dividend previously declared but not payable until a later date. The Court considered it similar to the interest coupon payable in the future which was involved in Helvering v. Horst, supra. Liability and amount were both unquestioned. A future maturity date was the only thing which prevented its immediate payment. It was paid to the transferee shortly after the transfer, in the same taxable year, and held taxable to the transferor. The case is a good example of the rule that the anticipatory assignment of earned income does not defeat income tax liability thereon. Carter v. Commissioner, 9 T.C. 364, 373-374.
 
 
 30
 In the present case, as stated by the Tax Court in 17 T.C. 916, the legal right to the income was being strenuously contested by the Government and there was no certainty at the time of the transfer that the transferor's right thereto would ever be established or that the money would ever be paid to either the transferor or transferee. The amount that might eventually be collected was unliquidated. Having previously held that by reason of the uncertainty of Cold Metal ever being able to collect on any of its claims for infringement such claims did not constitute accrued income to it in 1945 and that Cold Metal was not taxable on it in 1945, we have real difficulty in now ruling that under the same circumstances and same uncertainties Cold Metal had nevertheless "earned" such income on December 29, 1945. The facts which prevented it from being accrued income in 1945 also prevented it from being "earned" income at that time in the usually accepted meaning of the term. "Earn" is defined in Webster's New International Dictionary, Second Edition, as: "1. To merit or deserve, as by labor or service; to do that which entitles one to (a reward, whether the reward is received or not); * * * 2. To acquire by labor, service or performance; * * *." (Emphasis added.) If the decision in the Cancellation suit had gone against Cold Metal in 1948, it would not have acquired the income or at any time been entitled to it. We do not think it can rightfully be classified as having been earned in 1945. In re Magazine Associates, Inc., D.C.S.D.N.Y., 43 F.Supp. 583; The Talus, 5 Cir., 248 F. 670, 673; Johnson County v. Crosier, Tex.Civ. App., 211 S.W.2d 299, 300.
 
 
 31
 Regardless of the terminology used with respect to the income, its taxability depends upon the actual circumstances existing at the time of the transfer. At that time, it was not income to Cold Metal. It was an unliquidated chose in action. Cold Metal divested itself of all title, interest and control over it at that time. Later developments over which Cold Metal had no control transformed it into taxable income which was paid to and received by the new owner for its sole use and benefit. These facts fall far short of classifying the transaction as an anticipatory assignment of income taxable to the assignor when later paid. In Harrison v. Schaffner, supra, 312 U.S. 579, at pages 580 and 582, 61 S.Ct. 759, the Supreme Court stated that the rule applicable to an anticipatory assignment of income applies when the assignor is entitled at the time of the assignment to receive the income at a future date and is vested with such a right. Cold Metal's right was not a vested right in 1945. We think that the absolute and unconditional assignment by it in 1945 of the income producing property together with a contingent right to income therefrom, payable, if at all, at some indefinite time in the future in an indeterminate amount, with respect to which the assignor had no voice or control whatsoever, prevents us from treating the case as one involving the anticipatory assignment of income, which when paid becomes taxable to the assignor. This conclusion is in accord with our previous ruling in Commissioner of Internal Revenue v. Timken, 6 Cir., 141 F.2d 625, 629. Compare: Anthony's Estate v. Commissioner, 10 Cir., 155 F.2d 980, 983, and Austin v. Commissioner, 6 Cir., 161 F.2d 666, 668, certiorari denied 332 U.S. 767, 68 S.Ct. 75, 92 L.Ed. 352, where the distinction is made between income actually earned at the time of the assignment and income the payment of which is contingent. Our conclusion is also supported by the rulings in United States v. Horschel, 9 Cir., 205 F.2d 646; Commissioner of Internal Revenue v. Reece, supra, 1 Cir., 233 F.2d 30; Carter v. Commissioner, 9 T.C. 364, affirmed, 2 Cir., 170 F.2d 911; Herbert v. Riddell, D.C. S.D.Cal., 103 F.Supp. 369, 384-385, Note 40; Telephone Directory Advertising Co. v. United States, supra, 142 F.Supp. 884, 135 Ct.Cl. 670; Motion Picture Corporation of California v. Commissioner, Board of Tax Appeals, Feb. 17, 1942, CCH-BTA Service, Dec. No. 12,425-F.
 
 
 32
 If we are wrong in this conclusion, the assessment against Cold Metal can nevertheless not stand because Cold Metal, as a corporation, had been dissolved in 1945 and was not in legal existence in 1949. We are not in agreement with the Commissioner's contention and the Tax Court's conclusion that even though it had dissolved in 1945 under the state law, it was still in existence in 1949 for Federal income tax purposes.
 
 
 33
 The Ohio General Corporation Law, relating to the dissolution of corporations, provides in Section 8623-79, Gen. Code, for voluntary dissolution of a corporation by the taking of certain corporate action and the filing of a verified certificate in the office of the Secretary of State stating certain facts including the fact that the corporation elects to wind up and dissolve. Section 8623-80, Gen.Code, provides that upon the filing of such certificate, together with other designated papers, "the corporation shall be dissolved." These provisions were complied with.
 
 Section 8623-80 further provides:
 
 34
 "Any corporation which shall be dissolved and any corporation whose articles have been cancelled shall cease to carry on its business and shall be without authority so to do, but it shall continue for the sole purpose of paying, satisfying and discharging any existing liabilities and obligations, collecting and distributing its assets and doing all other acts required to adjust, settle and wind up its business and affairs, and it may do all such acts and may sue and be sued in its corporate name."
 
 
 35
 The foregoing provisions of the Ohio Statutes are not ambiguous. Under them Cold Metal's corporate existence was dissolved. It was not carrying on business thereafter while in the process of liquidating, since the statute expressly states that the dissolved corporation shall cease to carry on its business "and shall be without authority so to do."
 
 
 36
 The Commissioner urges upon us in support of a different ruling our consideration of the numerous law suits which were prosecuted or defended subsequent to 1945 and through 1949, to which Cold Metal was a party. The parties have stipulated that Cold Metal acquired no assets after December 28, 1945, and had no income or disbursements. These suits involved transactions entered into prior to its dissolution and were a necessary part in the winding up of its business and affairs. They were for the exclusive use and benefit of the Trustee, not Cold Metal. They were authorized by the same Ohio statute which provided that the corporation was dissolved. Nor is the number of such law suits material, provided they are actually for the purpose of winding up its affairs.
 
 
 37
 The Commissioner and the Tax Court rely upon Henry Hess Co. v. Commissioner, 16 T.C. 1363, as holding to the contrary. In that case, the Tax Court held that a California corporation, although dissolved under the California statute, was nonetheless existing for the purpose of winding up its affairs and possessed sufficient vitality to be taxable on gains incident to such winding up of its affairs. The ruling is really a Federal income tax ruling that a corporation, although legally dissolved under state law, is nevertheless liable under certain circumstances, for income taxes accruing in subsequent years. Part of the special circumstances existing in that case was the fact that the income which was held taxable was actually paid to and received by the so-called corporation even though dissolved at the time. Notwithstanding those special circumstances, we have difficulty in reconciling our fundamental concept of Federal income taxation with the proposition that an income tax can be assessed against a non-existing corporation. The making of an assessment would seem to require the existence in the taxable year of the taxpayer against whom the assessment is to run. Income tax liability is statutory. We find no Federal statute which requires a non-existing taxpayer to file an income tax return or which imposes an income tax liability for a certain year upon a so-called taxpayer who was not in existence during that taxable year.
 
 
 38
 The ruling in the Henry Hess Co. case was reversed on review by the Court of Appeals for the Ninth Circuit. Commissioner of Internal Revenue v. Henry Hess Co., 210 F.2d 553. The Court of Appeals relied upon Treasury Regulation 111, Section 29.52-1, which requires a corporation having an existence during any portion of a taxable year to make a return for that part of the year during which it was in existence. The Regulation provides: "* * * A corporation is not in existence after it ceases business and dissolves, retaining no assets, whether or not under state law it may thereafter be treated as continuing as a corporation for certain limited purposes connected with winding up its affairs, such as for the purpose of suing and being sued. If the corporation has valuable claims for which it will bring suit during this period, it has retained assets, and it continues in existence. * * *" It held that the corporation having dissolved was not in existence during the taxable year in which the income accrued, was not required to make a return, and could not be assessed for an income tax liability for the year in question. The Tax Court in the present case referred to the reversal of its ruling but stated that it thought its own decision in the case was correct and followed it in making its ruling. We are of the opinion that the Regulation fits this case. Cold Metal retained no assets and following dissolution it had no valuable claims for which it brought suit in its own right. We agree with the ruling of the Court of Appeals. See also: Novo Trading Corp. v. Commissioner, 2 Cir., 113 F.2d 320; A. B. C. Brewing Co. v. Commissioner, 9 Cir., 224 F.2d 483, 491-492; Herbert v. Riddell, supra, D.C. S.D.Cal., 103 F.Supp. 369, 384-385. In Telephone Directory Advertising Co. v. United States, supra, 142 F.Supp. 884, 889, the Court of Claims stated in partial support of its ruling favorable to the dissolved corporate taxpayer, "The plaintiff did not realize the income because it was not in existence when it accrued and was paid."
 
 
 39
 The judgments are reversed and the cases remanded to the Tax Court for further proceedings consistent with the views expressed herein.